# Exhibit A

Page 1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
INDEX NO. 1:20 Civ.6727 (AJN)

--------------------------------x
JEFFREY M. GOLDMAN,

              Plaintiff,

        vs.

SOL GOLDMAN INVESTMENTS LLC,
SOLIL MANAGEMENT, LLC AND
JANE H. GOLDMAN,

              Defendants.
--------------------------------x

COPY

              DEPOSITION OF:  JEFFREY M. GOLDMAN

              DATE:  TUESDAY, AUGUST 17, 2021

Page 8

1                    So if you could, please -- do you

2    have a copy of the complaint filed in this action?

3          A.      Which exhibit is it?

4          Q.      Exhibit 1.  Okay.

5                    So for the record, we are marking as

6    Exhibit 1 the first amended complaint filed in this

7    action on December 3 of last year?

8                    (Whereupon, Exhibit 1 was marked for

9    identification.)

10                   MR. KIRSCHENBAUM:  To be clear, you

11   are not going to put the exhibit up on the screen?

12                   MR. BAUCHNER:  The witness said he

13   had it.

14                   MR. KIRSCHENBAUM:  Okay.

15   BY MR. BAUCHNER:

16         Q.      Are you ready, Mr. Goldman?

17         A.      Yes.

18         Q.      Okay.

19                   Paragraph 2 it says:  At 69 years

20   old, Plaintiff Goldman was one of defendants' most

21   successful attorneys on a team that represents

22   defendants in many hundreds of housing court cases

23   each year?

24                   What facts do you have in your

25   possession, sir, to support that allegation?

Jeffrey Goldman v. Sol Goldman Investments, LLC, et al.                    Jeffrey M. Goldman 8/17/2021

Page 9

1          A.       Well, there are numerous cases that I
2     won for the defendants.
3                   Do you want a list?  I don't have a
4     list, but I know some of them.
5          Q.       Sure, please.
6          A.       Okay.  There are many non-primary
7     residence holdover proceedings, Sandra Bernheck,
8     (phonetic) she was a tenant leader at 145 West 55th
9     Street.  There was a case against somebody named
10    Halberson (phonetic) at 1700 First Avenue.  There
11    was another case against somebody named Sund Home
12    (phonetic).
13                  There was a -- there were many cases.
14    They don't all come to mind, but, many of them were
15    upheld on appeal.  And if you gave me a minute, I
16    could probably think of some more, but many, many
17    cases.  They are all recorded.  They are of record
18    in the New York state law reporting service.
19         Q.       And were those all nonprimary
20    residence cases, sir?
21         A.       No.  There were nonpayment
22    proceedings.  There was a case where the
23    deregulation of an apartment where I got the owner a
24    three-bathroom, six -- I believe six-room apartment
25    at 1700 First Avenue in which an attorney,

Page 10

1    Edward Savage, (phonetic) lived.  There were many,

2    many cases.

3                 Recently, they were sued by a tenant

4    for contempt of court for not making corrections or

5    violations.  That was the Jennifer Fishbein

6    (phonetic) case, and the judge sided with the

7    landlord, with my client's -- my former client's

8    position that the violations had been timely and

9    correctly -- corrected, and she did not hold the

10   landlord in contempt.  And the landlord's position

11   was also supported by the New York City department

12   of Housing Preservation and Development.

13        Q.    Were the cases that you named in

14   response to the initial question nonprimary

15   residence cases?

16        A.    Some of them were.  There were all

17   types of cases.  There were nonprimaries.  There

18   were legal sublet cases.  There were nuisance cases.

19                 I succeeded on a nuisance case

20   against a rent-controlled tenant, and the person was

21   evicted.  Not only was that a -- just a court

22   victory for the landlord, but that enabled the

23   landlord to sell that apartment of former tenant,

24   John Flynn, (phonetic) for well over a million

25   dollars.  So it is not just getting back the

Jeffrey Goldman v. Sol Goldman Investments, LLC, et al.                    Jeffrey M. Goldman 8/17/2021

Page 11

1    apartment.

2                    In that case what was able to be

3    done, there was a rent-controlled tenant on the east

4    side where an apartment was rented for 100 -- I am

5    sorry, on the west side -- where an apartment was

6    rented for a hundred-something dollars a month by a

7    rent-control tenant.  And on a nonprimary case, we

8    settled, and the person gave up the apartment.  And

9    the owner then, I believe, represented it to a

10   consulate for several thousand dollars a month.

11                   There was another case against

12   somebody on 25 West 68th Street.

13                   Nancy Lynch, (phonetic) who lived

14   down in Pennsylvania, we had a nonprimary case.  We

15   went to the appellate term on an interlocutory

16   appeal that the other side brought which we won.

17                   I had a case 235 West 22nd Street

18   against Olig Enchauff (phonetic) who was living in

19   Europe somewhere and -- I guess former Soviet

20   Union -- and we won that case.

21                   There was an interlocutory appeal in

22   which the tenant's attorney claimed we were supposed

23   to serve him at the Hague in, I guess, Belgium, and

24   the appellate court sided with us and we then

25   concluded the trial and we won.

Page 12

1               I would say percentage-wise, I won

2   and settled a lot more nonprimaries and holdovers

3   than were lost.

4          Q.     What would that percentage be, in

5   your estimation?

6          A.     At least 80 percent.

7          Q.     Oh.  Okay.

8               And this is over your 20-year career?

9          A.     Yes.

10          Q.     What was the name of the consulate

11   case you mentioned?

12          A.     I don't remember the name of the

13   tenant.  It was a Hispanic name as I recall, and he

14   was in a nursing home.

15          Q.     Do you remember the Woodword Levy

16   (phonetic) case?

17          A.     Yes, I do.

18          Q.     Was that a win or a loss?

19          A.     That was a loss.

20          Q.     How about --

21          A.     The --

22          Q.     The --

23          A.     -- in that case.

24               Which case?

25          Q.     The Wiseman (phonetic) case?

Jeffrey Goldman v. Sol Goldman Investments, LLC, et al.                    Jeffrey M. Goldman 8/17/2021

                                                                    Page 23

1    and there is a history of both my father and

2    grandfather died of heart attacks in their 50s.

3            Q.      And what's the blood pressure issue?

4            A.      High blood pressure, hypertension.

5            Q.      Did you ever contract COVID?

6            A.      Not to my knowledge.

7            Q.      Are you vaccinated?

8            A.      Now I am, yes.

9            Q.      Who advised you that these conditions

10   were potentially life-threatening?

11           A.      I called my physician and discussed

12   it with my physician.

13           Q.      And who is that?

14           A.      Dr. Doron Katz.

15           Q.      And he told you that returning to

16   the office was life-threatening?

17                   MR. KIRSCHENBAUM:  Objection.

18                   THE WITNESS:  That it was risky.

19   BY MR. BAUCHNER:

20           Q.      Did he say life-threatening?

21           A.      No, I don't believe he used those

22   words.

23           Q.      Then why are they in your complaint,

24   sir?

25           A.      It's high risk for COVID.  That was

Jeffrey Goldman v. Sol Goldman Investments, LLC, et al.                    Jeffrey M. Goldman 8/17/2021

Page 24

1   what he told me.  I -- I consider that

2   life-threatening.  I understand that quite a few

3   hundred thousand people have died of COVID, so I

4   would classify that, from a common-sense

5   perspective, as life-threatening.

6          Q.      When were you vaccinated?

7          A.      February and March of 2021.

8          Q.      Who vaccinated you?

9          A.      A nurse at a hospital.

10         Q.      Have you been hospitalized over the

11  past year?

12         A.      No.

13         Q.      Were you hospitalized last year?

14         A.      No.

15         Q.      Have you left your home?

16         A.      Yes.

17         Q.      When was the last time you left your

18  home?

19         A.      Probably Sunday.

20         Q.      What did you do?

21         A.      I don't remember, but I know I was

22  outside Sunday.

23         Q.      You were outside Sunday, and you

24  don't recall what you did two days ago?

25         A.      Probably went swimming.

Jeffrey Goldman v. Sol Goldman Investments, LLC, et al.                                    Jeffrey M. Goldman 8/17/2021

Page 32

1  scientific knowledge.

2       Q.    Are you refusing to answer

3  the question; yes or no?

4              MR. KIRSCHENBAUM:  Objection.

5              THE WITNESS:  I answered the

6  question.

7  BY MR. BAUCHNER:

8       Q.    Mr. Goldman, are you refusing to the

9  question; yes or no?

10              MR. KIRSCHENBAUM:  Jeff, I will allow

11  you to answer the question again because

12  Mr. Bauchner is so tough.

13              THE WITNESS:  Read the question

14  again, please.

15              MR. BAUCHNER:  It's going to be a

16  long day at this rate.

17              MR. KIRSCHENBAUM:  It's a

18  self-inflicted wound.

19              (Whereupon the previous question was

20  read back by the reporter.)

21              THE WITNESS:  Yes, my understanding

22  is that in June of 2020, I was not vaccinated.

23  After March of 2021, I was vaccinated, and I feel

24  confident that I can safely swim in a public pool

25  and I can safely walk in a park.

Page 33

```
 1   BY MR. BAUCHNER:

 2          Q.      And you feel confident enough that

 3   you never discussed it with your doctor, correct?

 4                  MR. KIRSCHENBAUM:  Objection.

 5                  THE WITNESS:  Yes, I feel confident.

 6                  And I want to add something, which

 7   is, as I already answered, I told you my doctor said

 8   I can exercise.  So walking and swimming are

 9   exercises.

10   BY MR. BAUCHNER:

11          Q.      Do you use the locker room at the

12   pool facility?

13          A.      It's an outdoor pool.  There's no

14   locker room.  And I don't use it -- I don't use the

15   bathroom there.  I just swim.

16          Q.      So you don't change there?

17          A.      No.

18          Q.      Do you walk there?

19          A.      I drive there in a car.

20          Q.      Have you been on the subway in the

21   past two years?

22          A.      No.

23          Q.      Have you used any public

24   transportation --

25          A.      Two years would be August of 2019,
```

Page 34

1    yes, I was on the subway between August 2019 and

2    March of 2020.

3                      So yes, I was on the subway in that

4    time period.

5           Q.       Have you used any public

6    transportation since March 15 of last year?

7           A.       I believe my last day of work was

8    March 16 or 17 in the office, so I would have used

9    public transportation that day or days, whichever

10   day was the last day.

11          Q.       How about after that?

12          A.       No, I have not used public

13   transportation since then.

14          Q.       Have you visited with any friends

15   since March 15 of last year?

16          A.       No.

17          Q.       Has anyone come to your home other

18   than your wife?

19          A.       No.

20          Q.       How many times have you seen your

21   daughters?

22          A.       I saw -- I think I saw them -- one of

23   them I saw maybe twice, and the other one I saw a

24   few times more than that.

25          Q.       And this is all since March 15 of

Page 35

1    last year?

2         A.      Yes.

3         Q.      Did you see them last year?

4         A.      The one that lives in New York City I

5    saw a few times.  I brought -- I saw a few times,

6    yeah.

7         Q.      So you have would have seen her

8    before you were vaccinated, correct?

9         A.      I saw her, yeah, before I was

10   vaccinated.

11                (Background speaking.)

12   BY MR. BAUCHNER:

13        Q.      And what is her profession?

14        A.      As Jane Goldman just told you, she is

15   a doctor.

16        Q.      Mm-hmm.

17                So what kind of doctor is she?

18        A.      She is a radiologist.

19        Q.      And so wouldn't she be exposed to her

20   patients?

21        A.      She is sitting in a room reading

22   X-rays, although she did have COVID patients earlier

23   in the year.

24        Q.      So why didn't your underlying health

25   conditions impact upon your ability to visit with

Page 36

1    her when you were unvaccinated?

2                    MR. KIRSCHENBAUM:  Objection.

3                    THE WITNESS:  I didn't visit with

4    her.  I brought some things to her apartment, placed

5    them on the sidewalk, and she retrieved them from

6    the sidewalk.  So if you count that as visit, yeah,

7    I visited with her.  But I didn't go into her

8    apartment, and I didn't do more than drop off

9    things, wait for her to pick them up, say hello and

10   goodbye and leave.

11   BY MR. BAUCHNER:

12        Q.      Where is her apartment?

13                    MR. KIRSCHENBAUM:  Objection.

14                    THE WITNESS:  In the --

15                    (Reporter clarification.)

16                    THE WITNESS:  I said in the Bronx.

17   BY MR. BAUCHNER:

18        Q.      And how did you get there?

19        A.      I drove.

20        Q.      You said you visited her multiple

21   times.

22                    What were the other times?

23        A.      The same thing where I brought over

24   stuff, left it, waited for her to come down and get

25   it.

Page 42

1    BY MR. BAUCHNER:

2         Q.      Do you -- sir, do you have an

3    understanding as --

4                 MR. KIRSCHENBAUM:  You can strike

5    your question, though.

6                 MR. BAUCHNER:  Please stop

7    interrupting me, Counsel.  Your conduct really is

8    unprofessional today.

9                 MR. KIRSCHENBAUM:  My client

10   testified, and you moved to strike his testimony.

11                MR. BAUCHNER:  You need to

12   understand, Counsel, you are on the record and this

13   is going to go before the court.  So please conduct

14   yourself appropriately for once.

15                MR. KIRSCHENBAUM:  Thanks for the

16   repeated guidance.

17   BY MR. BAUCHNER:

18        Q.      Mr. Goldman, on what basis do you

19   allege that Solil Goldman Investments is your

20   employer?

21        A.      When I appeared in court, I was

22   always instructed to say, So-and-so of Counsel to

23   Judith M. Brener, attorneys for Solil Goldman

24   Investments, LLC.

25        Q.      Sir, how many years have you been

Page 43

1   practicing?

2        A.      Over 40 years approximately.

3        Q.      Okay.

4                And you understand the difference

5   between being employed by someone and representing

6   them, correct?

7        A.      Yes.

8        Q.      When you appeared in court, were you

9   appearing on behalf of the entity as its attorney in

10  a representative capacity?

11       A.      Yes.

12       Q.      Okay.

13               So on what basis would that make them

14  your employer?

15               MR. KIRSCHENBAUM:  Objection.

16               THE WITNESS:  Solil Goldman

17  Investments owns all the buildings and owns the

18  entity that cut the check for my salary, Solil.

19  BY MR. BAUCHNER:

20       Q.      Solil Management cut had check for

21  your salary, correct?

22       A.      Right.  And it is, in turn, owned by

23  Solil Goldman Investments.

24       Q.      When you go to court and you're

25  representing an entity, it is not your contention

Page 44

1    that you are employed by that entity, correct, sir?

2         A.     Well, when one is an in-house

3    counsel, you are wrong.  You are representing your

4    employer.  There is a difference when you are an

5    in-house counsel.  So yes, I was representing my

6    employer.

7                If I worked for Ansell & Grimm and I

8    represent Jane Goldman, I am representing

9    Jane Goldman.  I'm not representing Ansell & Grimm.

10   But when I work for Jane Goldman and Jane Goldman

11   owns a building and I go to court, I am representing

12   Jane Goldman and I am employed by Jane Goldman, as I

13   was.

14        Q.     And are you, then, employed by that

15   building as well, sir?

16        A.     No, the buildings are basically

17   nominal LLCs.  They are individual partnerships.

18   They own the deed to the building, but in turn,

19   every building is owned by Solil Goldman

20   Investments, LLC.

21        Q.     So -- but if you're going into court,

22   like you said, sir, in an in-house capacity and you

23   are representing one of those LLCs, wouldn't,

24   through your own logic, they be your employer as

25   well?

Page 45

1                     MR. KIRSCHENBAUM:  Objection.  This

2     is argument, not factual questions.

3     BY MR. BAUCHNER:

4          Q.     You can answer the question.

5          A.     I don't know the answer to that

6     question.

7          Q.     Well, this is what you testified to,

8     that when you go to court as in-house counsel and

9     you are representing an entity, you are also

10    employed by that entity, correct; that is your

11    testimony?

12         A.     Yes.

13                    MR. KIRSCHENBAUM:  Objection.  This

14    is legal argument, not testimony of fact.

15    BY MR. BAUCHNER:

16         Q.     You are then representing each of the

17    LLCs -- or excuse me -- you are then employed by

18    each of the LLCs that you are representing in court,

19    correct, in your theory?

20         A.     In my theory, I am employed by Solil

21    Goldman Investments which, in turn, owns each of the

22    entities.  They own 1219 East 69 Street, LLC.  They

23    own 450 East 56th Street, LLC.  They own 1700 First

24    Avenue, LLC, et cetera.

25         Q.     Are you also employed by Solil

Page 46

1   Management.

2          A.      Yes.

3          Q.      So you have hundreds of employers

4   based on your theory; is that correct?

5          A.      No.

6                  MR. KIRSCHENBAUM:   Objection.

7   Argumentative.

8   BY MR. BAUCHNER:

9          Q.      You are employed by Solil Goldman

10  because, in your testimony, they are a parent entity

11  that owns a number of LLCs, all of which you

12  represent, and therefore would be employing you.

13  And you are also employed by Solil Management,

14  correct?

15         A.      I am employed -- I was employed by

16  Solil Goldman Investments, LLC, and Solil

17  Management, LLC.

18         Q.      Did you ever have a paycheck that

19  said Solil Goldman Investments on it?

20         A.      Not to my knowledge.

21         Q.      Does your W-2 reflect Solil Goldman

22  Investments on it?

23         A.      Not to my knowledge.

24         Q.      Did you ever have a paycheck from

25  Jane Goldman?

Page 60

1         A.      I don't remember exactly when I

2    applied that it was June or July, that's number 1.

3    Number 2, in your compound question is I probably

4    identified Solil Management, LLC, as my employer

5    because that is the entity that issues the paycheck.

6         Q.      Did you start working for Solil

7    Management in or around June of 2000?

8         A.      I started working for Solil on

9    June 26, 2000, so --

10        Q.      How old were you?

11        A.      -- so I retired two days before my

12   20th anniversary with the company.

13        Q.      How old were you at the time that you

14   started working in June of 2000?

15        A.      I guess I was 49.

16        Q.      Did you ever appear in federal court?

17        A.      A few times.

18        Q.      Did you ever appear in federal court

19   over the past two years?

20        A.      I'm not sure.  I don't think so.

21        Q.      Is there a reason you didn't appear

22   in federal court?

23        A.      Yes.  I -- probably you were

24   appearing instead of me, your firm.

25        Q.      Is there a reason we were appearing

Page 64

```
 1          Q.      Are you admitted anywhere else to
 2   practice law other than New York?
 3          A.      Various federal courts in New York.
 4   That's it.
 5          Q.      So you were responsible for the
 6   litigation that was pursued or defended on behalf of
 7   Solil Management and SGI; is that correct?
 8          A.      I don't know what you mean by
 9   "responsible."
10          Q.      Did you control the litigation that
11   was --
12          A.      No.
13          Q.      You didn't?
14          A.      I did not control the litigation.
15          Q.      Who did?
16          A.      Judith M. Brener and Jane Goldman.
17          Q.      Do you believe that Jane Goldman is a
18   micro-manager?
19          A.      Yes.
20                  MR. KIRSCHENBAUM:  Objection.
21   BY MR. BAUCHNER:
22          Q.      Why is that?
23          A.      I worked previously in-house for
24   somebody for 9 years who gave me implicit authority,
25   who hired me, trusted my judgment.  Jane Goldman
```

Page 65

1   trusts almost nobody, and is a micro-manager be par

2   excellence.  I asked her -- I asked --

3                  (Background speaking)

4                  MR. KIRSCHENBAUM:  I am sorry.  Is

5   Ms. Goldman testifying here?

6                  I'm a little confused.  I here a

7   voice in the background.

8                  THE WITNESS:  That is Jane Goldman's

9   voice.

10                  MR. BAUCHNER:  That is inaccurate.

11  But go on --

12                  MR. KIRSCHENBAUM:  Is somebody saying

13  something on the record in your room?  I hear

14  someone talking loudly while my client is

15  testifying.

16                  MR. BAUCHNER:  ---

17                  Mr. Kirschenbaum --

18  BY MR. BAUCHNER:

19      Q.    Mr. Goldman, do you want to continue

20  with your answer, or should I go to the next

21  question?

22      A.    I asked Jane Goldman what was

23  the amount of my authority, and I was told $300.

24  And I was told for the most part, any settlement had

25  to be run by Jane Goldman.

Page 131

1                     MR. BAUCHNER:  Please don't interrupt

2     me, Mr. Kirschenbaum.

3                     MR. KIRSCHENBAUM:  Too late.

4     BY MR. BAUCHNER:

5          Q.     Why didn't you follow up with

6     Ms. Brener or Ms. Ferrari in the interim week

7     period, regarding your reasonable accommodation?

8          A.     I continued to work from home on the

9     following Monday and got no negative feedback.

10                    Nobody called me on Monday, June 22

11    and said; Hey where are you?  Or Tuesday, June 23.

12                    So I continued to work a pace based

13    on the note from my physician.

14         Q.     So you received no negative feedback

15    to your request for a reasonable accommodation?

16         A.     I received no response period from

17    Brener or Ferrari.

18         Q.     Okay.  So the first response -- it's

19    your testimony, the first response to your request

20    for a reasonable accommodation came approximately a

21    week later, when Ms. Goldman called you, correct?

22         A.     Yes.

23         Q.     What did Ms. Goldman say, when she

24    called you?

25         A.     The exact language I --

Page 141

1          Q.      And do you know that to be accurate,

2    that information?

3          A.      I don't know it one way or the other.

4    That is what I was told.

5          Q.      And you don't know who told you?

6          A.      I don't remember who told me.  No.

7          Q.      Since you have no facts in your

8    possession to support that, wouldn't it have been

9    safe for you to return to the office in the absence

10   of anyone being in the building?

11         A.      No.  It's not true that nobody was in

12   the building.  People were in the building.  Solil

13   employees.

14         Q.      Other than Solil employees?

15         A.      The building is not next door to my

16   house.  I would have to traverse from my house to

17   the building.  That is in the public.  That's is

18   where COVID was being spread, in the public by mass

19   transit.

20                 New Jersey Transit conductors died.

21   Subway conductors died.  It's not just a matter of

22   going into the building.  It's at matter of the

23   whole process.

24         Q.      When you dropped off your computer

25   equipment, how did you get to the building?

Page 132

1                    It was something to the effect of,

2    first she congratulated me on the engagement of one

3    of my daughters.  Then she criticized the fact that

4    I had spent time working on an appellate brief, and

5    I reminded her that she asked me to appeal that

6    case, the Levine case and then she went into her

7    spiel that we had -- I don't remember the exact

8    words -- we have a pension, you should retire.  And

9    then is she said you are furloughed until court

10   opens.  But fired me by closing off my computer and

11   cell phone and the like.

12        Q.     Do you recall telling Ms. Goldman she

13   should fire you, so you can collect unemployment?

14        A.     What I recall is her saying, you

15   should retire.  I said, I am not going to retire.

16   You'd have to fire me, then I will collect

17   unemployment.  She said something to the effect of,

18   you won't win that.  You never win anything.

19                    I never won any cases for her, that's

20   why she got back probably 50 or 60 apartments

21   minimum over 20 years, because I never won any cases

22   for her.

23        Q.     Anything else from that conversation

24   that you can recall, sir?

25        A.     No.  She hung up on me.