# Exhibit B

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   CASE NO. 1:20-cv-06727
     ------------------------------X
 3   JEFFREY M. GOLDMAN,
 4                   Plaintiff,
 5   v.
 6   SOL GOLDMAN INVESTMENTS LLC,
     SOLIL MANAGEMENT LLC and
 7   JANE H. GOLDMAN,
 8                   Defendants.
     ------------------------------X
 9
10
11
12        DEPOSITION VIA ZOOM OF JANE H. GOLDMAN
13                  August 18, 2021
14
15
16
17
18
19
20
21
22   Reported by:
23   SARA FREUND, CSR
24
25
```

|  |  |
|---|---|
| Page 2<br>1<br>2<br>3<br>4<br>5<br>6<br>7<br>8<br>9<br>10       August 18, 2021<br>11       10:10 a.m.<br>12<br>13<br>14<br>15<br>16<br>17<br>18<br>19   DEPOSITION VIA ZOOM OF JANE H. GOLDMAN,<br>20  held on the above mentioned date and time,<br>21  before Sara Freund, a Certified Shorthand<br>22  Reporter and Notary Public within and for the<br>23  State of New York.<br>24<br>25 | Page 4<br>1     IT IS HEREBY STIPULATED AND AGREED by and<br>2  between counsel for the respective parties<br>3  hereto, that the filing, sealing, and<br>4  certification of the within deposition shall<br>5  be and the same are hereby waived;<br>6     IT IS FURTHER STIPULATED AND AGREED that<br>7  all objections, except as to the form of the<br>8  question, shall be reserved to the time of<br>9  trial;<br>10    IT IS FURTHER STIPULATED AND AGREED that<br>11  the within deposition may be signed before<br>12  any Notary Public with the same force and<br>13  effect as if signed and sworn to before this<br>14  court.<br>15<br>16<br>17<br>18<br>19<br>20<br>21<br>22<br>23<br>24<br>25 |
| Page 3<br>1 A P P E A R A N C E S:<br>2<br>3 JOSEPH & KIRSCHENBAUM LLP<br>    Attorneys for Plaintiff<br>4   32 Broadway - Suite 601<br>    New York, New York 10004<br>5 BY: D. MAIMON KIRSCHENBAUM, ESQ.<br>    LEAH SELIGER, ESQ.<br>6<br>7 ANSELL GRIMM & AARON, P.C.<br>    Attorneys for Plaintiff<br>8   365 Rifle Camp Road<br>    Woodland Park, New Jersey 07424<br>9 BY: ANTHONY J. D'ARTIGLIO, ESQ.<br>10<br>11 ALSO PRESENT:<br>12 Jeffrey M. Goldman<br>13<br>14<br>15<br>16<br>17<br>18<br>19<br>20<br>21<br>22<br>23<br>24<br>25 | Page 5<br>1         J. H. GOLDMAN<br>2  J A N E  H.  G O L D M A N, after having<br>3  first been duly sworn by a Notary Public of<br>4  the State of New York, was examined and<br>5  testified as follows:<br>6    Q.  State your name and address for the<br>7  record.<br>8    A.  Jane H. Goldman, 1185 6th Avenue,<br>9  New York, New York.  I don't know the zip.<br>10 EXAMINATION BY<br>11 MR. KIRSCHENBAUM:<br>12    Q.  Good morning, Ms. Goldman.  Have you<br>13  ever been deposed before?<br>14    A.  Yes.<br>15    Q.  So I'm going to assume that you're<br>16  familiar with the general rules of<br>17  depositions; is that correct?<br>18    A.  No.<br>19    Q.  Is there any reason that you are<br>20  unable to testify truthfully today?<br>21      MR. D'ARTIGLIO:  Objection.<br>22    A.  No.<br>23    Q.  Your attorney may object to certain<br>24  of my questions.  Unless he instructs you not<br>25  to answer, it's important that you answer my |

2 (Pages 2 - 5)

Page 10
J. H. GOLDMAN
1
2  know.
3   A. I don't know.
4      MR. KIRSCHENBAUM: Anthony, just to
5   be clear --
6   Q. And I'll make this clear to you, Ms.
7 Goldman, for any question, I'm only asking
8 you if you know the answer to the question.
9 If you don't know the answer, saying you
10 don't know is an acceptable answer.
11  A. Thank you.
12  Q. Do you know who the owners of Sol
13 Goldman Investments LLC are?
14     MR. D'ARTIGLIO: Objection. Just as
15  we discussed earlier, Mr. Kirschenbaum,
16  Ms. Goldman is here in her personal
17  capacity, not as a --
18     MR. KIRSCHENBAUM: I'm asking her --
19     MR. D'ARTIGLIO: Let me finish. I'm
20  not going to instruct her not to answer,
21  so just hold on. She's not the corporate
22  designee for SGI, who more likely and
23  more accurately would be able to answer
24  your question. With that in mind, she's
25  free to answer. I'm just making it clear

Page 11
J. H. GOLDMAN
1
2  for the record that she's not here to
3  testify as the corporate designee of SGI.
4   Q. And again, I'll make clear on the
5 record right now that any testimony that
6 you're giving now, it sounds like it's going
7 to be adopted by Solil Management LLC, as
8 your attorney has told me, but you are not
9 testifying as corporate designee of Sol
10 Goldman Investments LLC; I'm asking you this
11 question in your individual capacity.
12     (Whereupon, the last question was
13     read back.)
14  A. No.
15  Q. Do you know what Solil Management
16 LLC is?
17     MR. D'ARTIGLIO: Objection to form.
18  A. No.
19  Q. Have you ever heard of the company
20 --
21  A. Yes, I've heard of the company.
22  Q. You heard of the company Solil
23 Management LLC?
24  A. Yes.
25  Q. Are you a member of that company?

Page 12
J. H. GOLDMAN
1
2  A. Not that I know of.
3  Q. Are you a principal of that company?
4     MR. D'ARTIGLIO: Objection.
5  A. I don't know.
6  Q. Do you hold a position with Solil
7 Management LLC?
8  A. I might. I don't know that.
9     MR. KIRSCHENBAUM: Counsel, maybe we
10  should take a break. I just want to be
11  clear, you said you designated this
12  witness on behalf of Solil Management and
13  you're adopting her testimony. The
14  questions I'm asking her are very basic
15  questions about Solil Management. If
16  your client is not prepared to answer
17  those, we're going to have to call in
18  another witness to testify on behalf of
19  Solil Management. Would you like to take
20  a break and talk to your client, or do
21  you want me to continue going?
22     MR. D'ARTIGLIO: We'll take a
23  five-minute break.
24     MR. KIRSCHENBAUM: Thank you.
25     (Whereupon, recess was taken.)

Page 13
J. H. GOLDMAN
1
2     MR. KIRSCHENBAUM: Just for the
3  record, the corporate designee that was
4  initially designated by Solil was Ms.
5  Goldman, and Solil is now withdrawing Ms.
6  Goldman's designation; is that right?
7     MR. D'ARTIGLIO: That's correct.
8  The federal rules permit us designate our
9  corporate designees. At this time we are
10  withdrawing Ms. Goldman as the designee
11  for Solil Management. Ms. Brener will be
12  technically the designee for both
13  companies, Solil Management and SGI. So
14  she can be deposed in her capacity as the
15  corporate designee on the date of her
16  deposition. And in light of that
17  withdrawal of Ms. Goldman as the
18  corporate designee for Solil Management,
19  Solil Management will not be adopting her
20  testimony, which will be clearly in her
21  individual capacity.
22  Q. Ms. Goldman, just to be clear, I'm
23 now asking you questions only in your
24 individual capacity and not as the
25 representative of Solil or SGI. Do you

4 (Pages 10 - 13)

Page 14

```
 1           J. H. GOLDMAN
 2   understand that?
 3      A.  Yes.
 4      Q.  Do you know who Ilona Shamis is?
 5      A.  Yes.
 6      Q.  Did she bring a lawsuit against
 7   Solil Management and yourself?
 8         MR. D'ARTIGLIO:  Objection.
 9      A.  I don't know the details.
10      Q.  The question was, did she bring a
11   lawsuit against Solil Management and
12   yourself?
13      A.  I don't know if it was a lawsuit or
14   an Unemployment claim.  Actually, I'm not
15   sure.  I just know she quit after she was
16   asked to come back to the office, and she
17   sued -- in what capacity, what point, what
18   for, I don't know -- for two weeks' pay.
19      Q.  Do you know if you countersued her?
20      A.  If what?
21      Q.  If you countersued her.
22         MR. D'ARTIGLIO:  Objection.
23      A.  I don't know that.
24      Q.  Do you know if you raised
25   counterclaims in that lawsuit?
```

Page 15

```
 1           J. H. GOLDMAN
 2         MR. D'ARTIGLIO:  Objection.  Asked
 3     and answered.  She said she doesn't know.
 4     But if you have anything to add, feel
 5     free.
 6      Q.  Could you answer the question,
 7   please, Ms. Goldman?
 8      A.  I did.  I said I don't know.
 9         MR. KIRSCHENBAUM:  I'm going to
10     share Plaintiff's Exhibit 17.
11         (Whereupon, Plaintiff's Exhibit 17
12     was referenced.)
13         MR. D'ARTIGLIO:  Mr. Kirschenbaum,
14     we did not receive this exhibit last
15     night.
16         MR. KIRSCHENBAUM:  I'm presenting it
17     to the witness now.
18         MR. D'ARTIGLIO:  Before you present
19     it to the witness, if you could scroll
20     down slowly so that I could review the
21     exhibit, I would appreciate that.
22         MR. KIRSCHENBAUM:  I could e-mail it
23     to you now, I can scroll through it page
24     by page, whatever makes it easier.
25         MR. D'ARTIGLIO:  If you could e-mail
```

Page 16

```
 1           J. H. GOLDMAN
 2     it to me now, I would appreciate that.
 3         MR. KIRSCHENBAUM:  Okay.
 4      Q.  I pulled this document file from the
 5   Court, it's Exhibit A to a motion that I'll
 6   represent to you -- and you don't have to
 7   confirm the truth of this -- it was filed on
 8   your behalf in the Southern District of New
 9   York, and it has a proposed amended answer
10   and counterclaim in the claims of Ilona
11   Shamis against Solil Management, Jane Goldman
12   and some other defendants.  Are you able to
13   see it?
14      A.  Yes.
15      Q.  I'm scrolling to the beginning of
16   the counterclaim section there, it is on page
17   7 of the document, and I'm directing your
18   attention to paragraph 2, where it says,
19   Defendant Counterclaim Plaintiff Jane Goldman
20   is a principal of Solil Management LLC.  Do
21   you see that?
22      A.  Yes.
23      Q.  Do you believe that this statement
24   in that document is accurate?
25         MR. D'ARTIGLIO:  Objection.  The
```

Page 17

```
 1           J. H. GOLDMAN
 2     document speaks for itself.  You can
 3     answer.
 4         MR. KIRSCHENBAUM:  The document
 5     doesn't speak for itself.  I'm asking her
 6     if it's accurate.  I know what it says.
 7     I'm asking her if it's accurate.
 8         MR. D'ARTIGLIO:  Mr. Kirschenbaum, I
 9     don't think the hostility is warranted.
10     I made --
11         MR. KIRSCHENBAUM:  There's no
12     hostility.
13         MR. D'ARTIGLIO:  Mr. Kirschenbaum,
14     you're interrupting, it's very
15     unprofessional.  Just let me finish.  I'm
16     not directing her not to answer.  I
17     objected.  She can answer.
18      Q.  And I'm stating for the record, to
19   clarify my question, I'm not asking you if
20   the document says what it says.  I'm asking
21   you if that statement is accurate.  The
22   statement that Jane Goldman is a principal of
23   Solil Management, is that an accurate
24   statement?  That is my question.
25         MR. D'ARTIGLIO:  Objection.  If you
```

Page 18

 1        J. H. GOLDMAN
 2   can answer.
 3      A.  Can you ask the question again?
 4      Q.  Is the statement that the Defendant
 5   Counterclaim Plaintiff Jane Goldman is a
 6   principal of Solil Management LLC an accurate
 7   statement?  Please do not look at your phone
 8   while I'm questioning you.
 9      A.  I'm sorry, I had an emergency, I had
10   no choice.
11      Q.  If you need to take a break, please
12   let me know --
13      A.  I had to read the message, that's
14   all I had to do.
15      Q.  The question is, is the statement
16   that Jane Goldman is a principal of Solil
17   Management LLC an accurate statement?
18          MR. D'ARTIGLIO:  Same objection.
19      A.  I believe it is.
20      Q.  So earlier you said you did not know
21   if you were a principal.  Have you changed
22   your mind on that point?
23      A.  No.  I'm sorry, you asked me if I
24   saw a document drawn up by my attorneys that
25   identified me as a principal, which you did

Page 19

 1        J. H. GOLDMAN
 2   not ask me before to begin with.
 3      Q.  I'm asking you now, are you a
 4   principal --
 5      A.  I have no reason to doubt the
 6   voracity of that statement drawn up by my
 7   lawyers.
 8      Q.  So now I'm asking you
 9   straightforwardly, are you a principal of
10   Solil Management LLC?
11          MR. D'ARTIGLIO:  Objection.  Asked
12      and answered already half a dozen times.
13      One more time, Ms. Goldman, you can
14      answer.
15      A.  From what you showed me, I believe
16   it's accurate.  I don't know if that's an
17   accurate piece of paper.
18      Q.  So you don't know if you're a
19   principal of Solil Management LLC?
20          MR. D'ARTIGLIO:  Objection.  The
21      testimony is quite clear, Mr.
22      Kirschenbaum.
23          MR. KIRSCHENBAUM:  It's not clear to
24      me.  The answer to the question so far --
25      A.  We have hundreds of companies where

Page 20

 1        J. H. GOLDMAN
 2   I have different titles, different
 3   designations, and do I know exactly the
 4   title, the designation of every company?  No,
 5   I do not know it.  I could tell you that by
 6   looking at that, provided that that is an
 7   accurate -- you know, whatever you showed me
 8   is an accurate representation, yes, I'm going
 9   to say it's fine, I would say that it's
10   accurate.
11      Q.  When you say "we have hundreds of
12   companies", who is "we"?
13          MR. D'ARTIGLIO:  Objection.
14      Q.  I'm asking you to explain your
15   testimony.
16      A.  It's a private company.
17      Q.  When you say "we have hundreds of
18   companies" --
19      A.  My family does.
20      Q.  Is Sol Goldman Investments LLC one
21   of those companies?
22          MR. D'ARTIGLIO:  Objection.
23      A.  I don't know that it's a company.
24      Q.  I'm sorry, I didn't hear your
25   answer.

Page 21

 1        J. H. GOLDMAN
 2      A.  I said I don't know that it's a
 3   company.
 4      Q.  You don't know if Sol Goldman
 5   Investments LLC is a company?
 6          MR. D'ARTIGLIO:  Objection.  Asked
 7      and answered.
 8      A.  No, I don't.
 9          MR. D'ARTIGLIO:  You're just
10      repeating the question.
11      Q.  I wasn't repeating.  I was just
12   clarifying that that was in fact the answer.
13          Was Jeff Goldman an employee of
14   Solil Management LLC?
15          MR. D'ARTIGLIO:  Objection.
16      A.  I believe that he was.
17      Q.  Do you believe that he was an
18   employee for about 20 years?
19      A.  I don't know the exact amount of
20   time.
21      Q.  Was it more than ten, in your
22   recollection?
23      A.  I would say more than ten.  Should
24   we try eleven?
25      Q.  Well, when you submit your

Page 22

```
 1              J. H. GOLDMAN
 2  declaration after you remember everything
 3  that you didn't remember during this
 4  deposition --
 5      A.  I don't remember how long he was
 6  here.
 7      Q.  -- you could put that in.
 8      A.  I said that, and you questioned me
 9  again.
10      Q.  Did Mr. Goldman's employment get
11  terminated by you?
12          MR. D'ARTIGLIO:  Objection.
13      A.  I don't know the definition of
14  terminating.
15      Q.  Did you terminate Mr. Goldman's
16  employment?
17          MR. D'ARTIGLIO:  Objection.
18      A.  I don't understand the question.
19          MR. KIRSCHENBAUM:  I'm sorry,
20      Anthony, the question was if she
21      terminated Mr. Goldman's employment.
22      You're objecting.  If you want to
23      obfuscate some finer points, that's fine.
24      But my question was if she terminated the
25      employment.  I'd like to ask you the
```

Page 23

```
 1              J. H. GOLDMAN
 2      basis for that objection.
 3          MR. D'ARTIGLIO:  Sure, absolutely.
 4      Do you mean did she personally?  She did
 5      not employ Mr. Goldman --
 6          MR. KIRSCHENBAUM:  I'm not asking
 7      you to tell her what to answer --
 8          MR. D'ARTIGLIO:  Excuse me, you just
 9      asked me to explain my objection --
10          MR. KIRSCHENBAUM:  Right.  I didn't
11      ask you to tell her what to answer.
12          MR. D'ARTIGLIO:  Stop yelling, sir.
13      You're yelling.
14          MR. KIRSCHENBAUM:  I am not yelling.
15          MR. D'ARTIGLIO:  We will not proceed
16      in this fashion.
17          MR. KIRSCHENBAUM:  You can make a
18      record for yourself --
19          MR. D'ARTIGLIO:  If you don't want
20      me to explain my objection, that's fine.
21      I'm explaining to you why I objected.
22          MR. KIRSCHENBAUM:  Don't explain
23      your objections; just make a little show
24      for your client.
25          MR. D'ARTIGLIO:  I'm making
```

Page 24

```
 1              J. H. GOLDMAN
 2      objections because your questions are
 3      improper.
 4          MR. KIRSCHENBAUM:  Do you believe
 5      that the question did you terminate Mr.
 6      Goldman's employment is not a proper
 7      question, just to be clear?
 8          MR. D'ARTIGLIO:  I believe it's
 9      phrased in a way that it's ambiguous and
10      vague, and so it's not a proper question.
11      Q.  Ms. Goldman, did you terminate Mr.
12  Goldman's objection?
13          MR. D'ARTIGLIO:  Objection.
14      A.  I don't understand what you mean by
15  "terminate."  Mr. Goldman terminated his own
16  employment.
17      Q.  What do you mean?
18          MR. D'ARTIGLIO:  Objection.
19      A.  "What do you mean?"  He retired.  He
20  resigned.
21      Q.  When did he resign?
22      A.  I believe it was June 24th.
23      Q.  How did he make his resignation
24  known?
25          MR. D'ARTIGLIO:  Objection.
```

Page 25

```
 1              J. H. GOLDMAN
 2      A.  He had had discussions with other
 3  people in the office, and then it was
 4  presented to me, and I was shocked that he
 5  had decided that he was no longer coming into
 6  the office and no longer going to court,
 7  which was his primary responsibility, so I
 8  gave him a call.  I was surprised he hadn't
 9  called me himself, considering, as you said,
10  that he's been a long-term employee, that he
11  didn't contact me personally, so I took that
12  on myself and I called him, at which point he
13  made it clear that he had no intention of
14  coming back to the office.  I said, Well,
15  Jeff I guess that means you're retiring.  And
16  he said, No, that doesn't mean that.  Could
17  you fire me so that I can collect
18  Unemployment?  Which, as he stated yesterday
19  in his deposition, he wanted me to fire him
20  so he could collect Unemployment, which he
21  stated to me on the phone, and he
22  acknowledged yesterday in his very own
23  deposition.  And I said, Jeff, I'm going to
24  take this as your retirement, that's not what
25  happened.  I said, You have a pension.  Why
```

7 (Pages 22 - 25)

Page 26

1  J. H. GOLDMAN
2 would I fire you?  Why would you take
3 Unemployment?  You're refusing to come to
4 work, and you have a pension.  If that's what
5 you're going with, go with your pension and
6 enjoy your retirement.
7     Q.  So just to be clear, did he say the
8 words he was retiring, or did he tell you he
9 wasn't coming to the office?
10     MR. D'ARTIGLIO:  Objection.
11     A.  No.  What he told me was that I
12 should fire him.  He had stated in a previous
13 correspondence with Judy that he was not
14 coming to work, he was not going to court,
15 which was his job.  So if he stopped going to
16 court, and he's not coming to work -- his job
17 did not entail working from home, and he
18 never stated if, when he would ever return to
19 court, so I assumed he was quitting.  He was
20 quitting.  That was quitting.  He said he
21 wanted to be fired so he could collect
22 Unemployment, pure and simple.
23     Q.  Did he ask you to work from home?
24     MR. D'ARTIGLIO:  Objection.
25     A.  Did he ask me?  No, he did not.

Page 27

1  J. H. GOLDMAN
2     Q.  Do you know if he asked Jane whether
3 he could work from home?
4     A.  I am Jane, and, no, he did not ask
5 me.
6     Q.  Do you know if he asked Judy Brener
7 if he could work from home?
8     MR. D'ARTIGLIO:  Objection.
9     A.  I think he sent a note to her that
10 he could continue to work from home.
11     Q.  Before the call on June 24th, did
12 you know that he was working from home?
13     A.  Everyone was working from home; it
14 was mandated by the State.
15     Q.  But June 22nd was the return-to-work
16 date at Solil, correct?
17     A.  Yes, which was also mandated by the
18 State as the first date we could return to
19 work.
20     Q.  And did you know that on the 22nd,
21 instead of coming to the office, Mr. Goldman
22 continued to work from home?
23     A.  I did not know that.
24     Q.  Why did you call him on June 24th?
25     A.  Because at that point, whatever

Page 28

1  J. H. GOLDMAN
2 conversations he had had, his correspondence
3 with Judy Brener, was brought to my
4 attention.  I was personally shocked, because
5 I had never known Jeff had any health issues
6 that precluded him from coming to the office.
7     Q.  Is the correspondence you're
8 referring to the correspondence in which he
9 said that he cannot return to work in the
10 office because of underlying health
11 conditions?
12     MR. D'ARTIGLIO:  Objection.
13     Mischaracterizes the document.  You can
14     answer.
15     A.  I don't know.  I'm looking at what
16 document?  Let me see the document.
17     MR. D'ARTIGLIO:  You want to show
18     her the document, Mr. Kirschenbaum?
19     Q.  I don't want to show you a document
20 --
21     A.  Well, I can't remember.  I have to
22 see exactly what I'm talking to.  I want to
23 give you an honest, truthful answer.  I do
24 not want to guess.  So please show me the
25 document, or allow me to find it.  But if you

Page 29

1  J. H. GOLDMAN
2 don't want to show me, then I can't answer
3 the question.
4     Q.  I'm sharing Plaintiff's Exhibit 2 on
5 the screen.
6     (Whereupon, Plaintiff's Exhibit 2
7     was referenced.)
8     Q.  Do you see this document?
9     A.  Yes.
10     Q.  And it's marked P001?
11     A.  I don't see the marking.
12     Q.  At the very corner you see the P001?
13     MR. D'ARTIGLIO:  I apologize, Mr.
14     Kirschenbaum, the bottom of my screen, we
15     cannot see the last small part of the
16     document.
17     Q.  Do you see a document from Jeff
18 Paley to Doron Katz dated June 3, 2020?
19     A.  I do.
20     Q.  Is that one of the correspondence
21 you were talking about that you were
22 surprised about?
23     MR. D'ARTIGLIO:  Objection.
24     A.  No.
25     MR. KIRSCHENBAUM:  I'm showing you

Page 30

J. H. GOLDMAN

now what was marked as Exhibit 18. It was not in what I sent to you yesterday, but it was in your production, Anthony.
    (Whereupon, Plaintiff's Exhibit 18 was referenced.)
    Q. Does this document look familiar to you?
    A. Yes, that looks familiar to me.
    Q. Is that the correspondence that you said you were surprised by?
    MR. D'ARTIGLIO: Objection. Do you mean both e-mails or one e-mail?
    Q. Well, let's start with the e-mail from Jeff to Judy on June 17, 11:48 a.m., saying at the end of the e-mail that he will not be able to return to court and not be able to return to the office. I can, however, continue working from home. Is that the document that you were referring to?
    A. I'm sorry, I'm lost now. Referring to when?
    Q. You said that you were shocked about the correspondence by Mr. Goldman, and that's why you called him on June 24th. I'm asking

Page 31

J. H. GOLDMAN

if this is the correspondence that you were shocked from?
    MR. D'ARTIGLIO: Objection.
    A. Yes, I was shocked by this.
    Q. And is that part of why you called him on June 24th?
    A. Yes.
    Q. And isn't it the case that Mr. Goldman in the last sentence of the e-mail made clear that he can continue working from home; was that your understanding of what he was saying?
    MR. D'ARTIGLIO: Objection.
    A. No. He never said this to me.
    Q. But you did see this.
    A. I saw it on the 24th, when I called him, because I didn't understand what was going on. I was surprised he was quitting.
    Q. Did he send you this document on the call, or did you see this document before you called him?
    MR. D'ARTIGLIO: Objection.
    A. He never sent this to me.
    Q. Did you see this document before you

Page 32

J. H. GOLDMAN

called him, or did you see it for the very first time on the telephone call?
    MR. D'ARTIGLIO: Objection. Compound question.
    A. I don't see things on telephone calls. But Judy brought this to my attention, and I gave him a phone call, which I have already said to you.
    Q. So she brought it to your attention. Did she forward this e-mail to you?
    A. No.
    Q. How did she bring it to your attention?
    A. She walked into my office -- as Jeff could have done.
    Q. And did she tell you that Jeff said that he could continue working from home?
    MR. D'ARTIGLIO: Objection.
    A. She brought me the letter.
    Q. And what did she say about the letter?
    MR. D'ARTIGLIO: Objection. Before you answer, I just want to be clear, Ms. Brener is general counsel for Solil

Page 33

J. H. GOLDMAN

Management, so you're in an attorney-client relationship. To the extent that you can answer the question with purely factual information, that would not be privileged and you're free to answer it. To the extent that there was any discussion of legal advice or things of that nature, that would be privileged and you should not disclose that information. With that instruction, you're free to answer the question.
    A. Could you repeat the question?
    Q. Did Ms. Brener tell you that Mr. Goldman stated that he was willing to work from home?
    MR. D'ARTIGLIO: Objection. Mischaracterizes the document.
    MR. KIRSCHENBAUM: I'm not characterizing. I'm asking a question.
    MR. D'ARTIGLIO: He testified he was willing to work from home --
    MR. KIRSCHENBAUM: Don't testify. I'm asking her if Mr. --
    MR. D'ARTIGLIO: You're screaming.

Page 34

J. H. GOLDMAN

1
2  A. I'm getting very upset. This is
3  disturbing, to be yelled at.
4       (Continuous simultaneous talk)
5  Q. I will rephrase the question. My
6  question on the record is not what the
7  document says. My question is, did Ms.
8  Brener tell you that Mr. Goldman was willing
9  to work from home?
10     MR. D'ARTIGLIO: Objection. You can
11     answer.
12  A. Not that I recall.
13  Q. So, you had a conversation with Ms.
14  Brener about Mr. Goldman, correct?
15  A. I don't remember the exact contents
16  of the conversation. She brought the note,
17  which is self-explanatory.
18  Q. Ms. Goldman, Ms. Brener brought you
19  this e-mail, or she brought you the doctor's
20  note or both?
21  A. I told you I did not see the
22  doctor's note then.
23  Q. So she just brought you this e-mail.
24  A. Yes, that Jeff was not coming back
25  to work.

Page 35

J. H. GOLDMAN

1
2  Q. And did you see in this e-mail at
3  the end of the e-mail that Mr. Goldman states
4  these words, "I can, however, continue
5  working from home"?
6  A. Well, the huge problem with that is
7  that Jeff was our court attorney. Jeff
8  cannot go to court from home. That was his
9  job. If he's not willing to go to court,
10  there is nothing for him to do. There was no
11  one else to do what he did, and that was to
12  go to court.
13  Q. So you believed that he should not
14  be allowed to work from home, correct?
15     MR. D'ARTIGLIO: Objection.
16  A. He could not do his job from home.
17  Q. And did you tell that to Mr. Goldman
18  when you spoke to him?
19  A. Not that I recall -- he knows it
20  himself.
21  Q. Were you aware at the time that
22  there were no in-person court hearings during
23  that period of time?
24     MR. D'ARTIGLIO: Objection.
25  A. Yes, I was aware. I wasn't asking

Page 36

J. H. GOLDMAN

1
2  him to go to court that day. But that's not
3  what he said. In here he says, I will not be
4  able to return to court, and I will not be
5  able to return to the office. He never
6  offered to ever go back to court. He stated
7  quite frankly that he was not going to court,
8  and he was not coming to the office. And if
9  you understood what his job was, that is
10  quitting.
11  Q. Did you tell him that that was
12  unacceptable to you?
13  A. Of course I told him.
14     MR. D'ARTIGLIO: Objection.
15  A. I didn't want him to quit. I wanted
16  him to stay. Nobody wanted him to leave.
17  Judy, as a matter of fact, some
18  correspondence she had directly with him,
19  which I'm sure you have in your exhibits,
20  what he wrote to her, she said, Jeff, your
21  our court attorney, help. He never offered
22  to help or give any other suggestions. He
23  didn't try to work out a way to make this
24  work. He just said, I'm not doing it.
25  Q. So you understood that to be him

Page 37

J. H. GOLDMAN

1
2  quitting; is that correct?
3  A. Yes, of course, that's quitting. If
4  you're saying, I can't do my job, I'm not
5  going to do my job, that's quitting, that's
6  retiring or whatever you want to call it. He
7  was not being fired. We had no intention of
8  firing Jeff.
9  Q. Even though he said in his e-mail, I
10  could continue working from home?
11     MR. D'ARTIGLIO: Objection.
12  A. He cannot do his job from home.
13  Q. So you did not believe that saying,
14  I could continue working from home meant that
15  he wanted to stay employed.
16     MR. D'ARTIGLIO: Objection.
17  A. It's not possible for him to do his
18  job from home.
19  Q. So you made it clear that that was
20  unacceptable to Solil; is that correct?
21     MR. D'ARTIGLIO: Objection.
22  A. No, I did not. I called him and I
23  asked him what was going on. I didn't want
24  him to leave. He said I should fire him so
25  he can collect Unemployment -- as you well

10 (Pages 34 - 37)

Page 38

1    J. H. GOLDMAN
2  know, because he stated that in his
3  deposition yesterday.
4     Q.  Did you ever talk to him about
5  accommodating his request to work from home?
6        MR. D'ARTIGLIO:  Objection.
7     A.  He didn't ask for any accommodations
8  from me.  He never asked me.
9     Q.  Did you not consider his request to
10 work from home in that e-mail to be a request
11 for an accommodation?
12       MR. D'ARTIGLIO:  Objection.
13    A.  No, I did not.  He never asked me
14 for any accommodation.
15    Q.  Did you consider whether allowing
16 him to work from home might be an
17 accommodation?
18       MR. D'ARTIGLIO:  Objection.
19    A.  No, that's not an accommodation.
20 It's an inability to do his job.  If he could
21 do his job from home, I would be happy to let
22 him do his job from home.  He cannot do his
23 job from home.
24    Q.  Did you engage with him in an
25 interactive process to talk about how the

Page 39

1    J. H. GOLDMAN
2  company might be able to accommodate him?
3     A.  No.  He didn't ask me.  Just for
4  your information, we accommodated everyone
5  throughout this entire process.  He did not
6  ask for an accommodation.  He asked to stay
7  home.  Unfortunately, his job is not one in
8  which he can stay home.  If it were, then he
9  wouldn't have to ask me if I can fire him so
10 he could collect Unemployment.
11    Q.  Are you aware of anything on
12 June 24, 2020 that required his in-person
13 participation?
14    A.  He did not ask.
15    Q.  I'm asking you.
16    A.  On June 24th?  Just in general,
17 attorneys meet and discuss cases in person in
18 our office.  Of course, we had taken every
19 possible precaution.  As you see, we're still
20 wearing masks.  We still have screens up.  We
21 have Purell every few feet.  No one in our
22 office has gotten COVID from anyone in our
23 office.  We have made every possible
24 accommodation.  We are unbelievably cautious
25 and safe.  So, yes, he should have come in.

Page 40

1    J. H. GOLDMAN
2  Did he need to be in court that day?  No.
3     Q.  Were you aware of any court
4  appearances subsequent to June that were
5  scheduled on June 24th that required his in-
6  person appearance?
7        MR. D'ARTIGLIO:  Objection.
8     A.  I have no idea.
9     Q.  Do you know if on June 24, 2020,
10 there was any matter at all that required his
11 in-person appearance?
12       MR. D'ARTIGLIO:  Just on that date?
13       MR. KIRSCHENBAUM:  No.  Anything
14    scheduled subsequent to June 24th.
15    A.  Excuse me.  On June 24th, he had
16 already quit.  So I don't know -- obviously,
17 if somebody quits it doesn't matter what's
18 ongoing.  He quit.  He left us.  After
19 20 years he just quit.
20    Q.  You testified that his job did not
21 allow him to work from home; isn't that
22 correct?  You said his job was not of the
23 nature that he could work from home; is that
24 correct?
25       MR. D'ARTIGLIO:  Objection.

Page 41

1    J. H. GOLDMAN
2     A.  No.  I said -- I don't know exactly
3  how I said it, but the nature of his job was
4  he was our court attorney.  Obviously, days
5  when there was no court, he came to the
6  office.  But when there was a court
7  appearance, that's what he needed to do.
8     Q.  Did you require him to come to the
9  office on June 22nd?
10       MR. D'ARTIGLIO:  Objection.
11    A.  I didn't require.  We had asked our
12 entire staff to return to the office on
13 June 22nd, in accordance with New York
14 mandated COVID requirements.
15    Q.  Did the company make an exception
16 for Jeff Goldman with respect to that
17 requirement?
18       MR. D'ARTIGLIO:  Objection.
19    A.  Did we make an exception?  He quit.
20 He wrote a letter he wasn't coming back.
21    Q.  Before the time that you allege that
22 he quit, did the company make an exception
23 for Jeff Goldman with respect to the return-
24 to-work requirement?
25    A.  No.  Why would we?  What exception

11 (Pages 38 - 41)

Page 42

1  J. H. GOLDMAN
2  was he?
3  Q. On June 23rd, 2020, do you recall
4  how many attorneys were employed at Solil?
5  A. No.
6  Q. Do you know if Solil hired any
7  attorneys in year 2020, after Mr. Goldman's
8  employment ended?
9  A. Yes, we did.
10  Q. Who hired --
11  A. I don't do the hiring attorneys.
12  Q. But what are their names?
13  A. I don't know.
14  Q. Did you hire one in the year 2020?
15  A. I believe Ms. Brener hired another
16  attorney, yes.
17     MR. KIRSCHENBAUM: Anthony, one of
18     our requests was to give us documents
19     relating to attorneys that were hired
20     after Mr. Goldman's termination. I don't
21     believe we received those documents. I'm
22     sure there was nothing nefarious about
23     it, but I just want to ask that the
24     company go back and produce those
25     documents.

Page 43

1  J. H. GOLDMAN
2     MR. D'ARTIGLIO: We'll take it under
3     advisement. I'm certain there will be a
4     notation in the transcript about it.
5     MR. KIRSCHENBAUM: I'll just send
6     you an e-mail. There might be an
7     indication in the transcript, as well.
8     MR. D'ARTIGLIO: That's fine, as
9     well.
10    (Whereupon, recess was taken.)
11  Q. Ms. Goldman, did you make decisions
12  with respect to Jeff Goldman's salary?
13  A. Yes.
14  Q. Who is Concheta?
15  A. Office manager.
16  Q. Do you know if Concheta called Mr.
17  Goldman's insurance company to notify them
18  that his Cobra should end in December 2020?
19     MR. D'ARTIGLIO: Objection.
20  A. I do not.
21  Q. Do you know anything about
22  Concheta's communications with respect to Mr.
23  Goldman's insurance?
24  A. I do not.
25     MR. D'ARTIGLIO: Objection.

Page 44

1  J. H. GOLDMAN
2  Q. Aside from Mr. Goldman talking to
3  you on the phone on June 24th, do you know if
4  he communicated to anyone else that he wanted
5  to retire?
6  A. Do I know? I don't know who he
7  speaks to.
8  Q. Right. So you do not know; is that
9  correct?
10  A. I have no idea.
11  Q. Did you ask him on the telephone
12  call why he was retiring?
13  A. Did I ask him why? That was the
14  whole purpose of the phone call.
15  Q. Did you ask him why he was retiring?
16     MR. D'ARTIGLIO: Objection. Asked
17     and answered.
18  Q. You can answer.
19  A. He told me he wanted me to fire him,
20  and I said, I'll take that as your
21  retirement. And he said, No, I want to be
22  fired so I can collect Unemployment.
23  Q. Did you point out to him on the
24  telephone that he could continue to work from
25  home if he wanted to?

Page 45

1  J. H. GOLDMAN
2     MR. D'ARTIGLIO: Objection.
3  A. He didn't ask to.
4  Q. But did you tell it to him?
5     MR. D'ARTIGLIO: Objection.
6  A. Why would I tell him if he didn't
7  ask me? He told me he wasn't coming back to
8  the office.
9  Q. Did you fire him so he could collect
10  Unemployment?
11  A. I didn't fire him at all.
12  Q. So it's your position that he left
13  voluntarily?
14  A. A hundred percent.
15  Q. Do you know if Solil contested Mr.
16  Goldman's application for Unemployment
17  benefits?
18  A. I don't know.
19  Q. Did you tell anyone that Mr. Goldman
20  had retired after the telephone call?
21  A. Yes.
22  Q. Who did you tell?
23  A. I believe I told Ms. Brener.
24  Q. Did you tell Ms. Brener that if he
25  files for Unemployment, she should make it

|  |  |
|---|---|
| Page 50<br>1           J. H. GOLDMAN<br>2    A. When he asked me to fire him, I<br>3 said, No, why don't you just retire and take<br>4 your pension?  He said, again, I don't want<br>5 to do that; fire me so I can collect<br>6 Unemployment.  It's what he wanted to do from<br>7 the beginning.<br>8    Q. Is it possible that his words were,<br>9 I'm not going to retire, you're going to have<br>10 to fire me?<br>11       MR. D'ARTIGLIO:  Objection.<br>12    A. No, it's not possible at all.<br>13    Q. Do you remember what his exact words<br>14 were?<br>15    A. No, I don't, but I know those<br>16 weren't them.<br>17    Q. Did you wonder why he would be<br>18 saying that to you one week after he made it<br>19 known to Ms. Brener that he wanted to<br>20 continue working from home?<br>21       MR. D'ARTIGLIO:  Objection.<br>22    A. I don't know what he made known to<br>23 Ms. Brener a week before because I did not<br>24 know about it, and our office was closed the<br>25 week before. | Page 52<br>1           J. H. GOLDMAN<br>2 come to the office, and he could not do --<br>3    A. Because he quit.<br>4    Q. -- because he could not do his work<br>5 remotely; is that right?<br>6       MR. D'ARTIGLIO:  Objection.<br>7    A. No, he cannot do his work remotely.<br>8    Q. And Solil did not allow him to do it<br>9 remotely?<br>10       MR. D'ARTIGLIO:  Objection.<br>11    A. No, he's allowed -- as long as the<br>12 government mandated that the courts be closed<br>13 and the office shut, everyone worked<br>14 remotely.<br>15    Q. But after June 22nd, Solil didn't<br>16 allow Mr. Goldman to work remotely; is that<br>17 correct?<br>18       MR. D'ARTIGLIO:  Objection.<br>19    A. He quit.  It had nothing to do with<br>20 allowing him.  He asked me to fire him so he<br>21 didn't have to work anymore, so he can<br>22 collect Unemployment.  He was not fired,<br>23 period.<br>24    Q. Did Solil allow Mr. Goldman to work<br>25 remotely after June 22nd? |
| Page 51<br>1           J. H. GOLDMAN<br>2    Q. Did you not testify earlier that Ms.<br>3 Brener came into your office with a copy of<br>4 Mr. Goldman's e-mail that he sent to her?<br>5    A. I did, and I said it was on the<br>6 24th.<br>7    Q. It was on the 24th that she came<br>8 into your office?<br>9    A. That's correct.  My office didn't<br>10 open until the 22nd, you understand that,<br>11 right?  The office was closed the week that<br>12 Jeff sent that to Judy.  Our office was not<br>13 open.  Everyone was working remotely.<br>14    Q. Did you not wonder why Mr. Goldman<br>15 would be retiring only one week after sending<br>16 the e-mail to Ms. Brener where he said he<br>17 could continue working from home?<br>18       MR. D'ARTIGLIO:  Objection.<br>19    A. I didn't wonder for one second.  It<br>20 was quite obvious to me he was quitting.  He<br>21 knows very well he could not do the job<br>22 remotely, period.  He can't do that job<br>23 remotely.<br>24    Q. So the reason his employment ended,<br>25 according to you, is because he refused to | Page 53<br>1           J. H. GOLDMAN<br>2       MR. D'ARTIGLIO:  Objection.  Asked<br>3    and answered.  You can answer.<br>4    A. He quit.<br>5    Q. Did Solil allow Mr. Goldman to work<br>6 remotely after June 22nd?<br>7       MR. D'ARTIGLIO:  Objection.  Asked<br>8    and answered.  If you have anything else<br>9    to add, feel free.<br>10       THE WITNESS:  I have nothing else to<br>11    add.<br>12    Q. You don't know whether Solil allowed<br>13 Mr. Goldman to work remotely after June 22nd?<br>14       MR. D'ARTIGLIO:  That's not what she<br>15    testified to.<br>16    A. I answered that already.<br>17    Q. What is your answer?<br>18    A. Read it back.<br>19    Q. The answer was he quit, which still<br>20 does not answer the question.  Between<br>21 June 24th --<br>22    A. After somebody quits, I don't try to<br>23 get them not to quit.<br>24    Q. What about before he quit, did Solil<br>25 allow -- |