# Exhibit C

Page 1

```
 1              UNITED STATES DISTRICT COURT
 2              SOUTHERN DISTRICT OF NEW YORK
 3    _____
 4    JEFFREY M. GOLDMAN,
 5            Plaintiff,
 6       v.                              Case No.
 7    SOL GOLDMAN INVESTMENTS LLC,       1:20-cv-06727-AJN
 8    SOLIL MANAGEMENT, LLC and JANE
 9    H. GOLDMAN,
10            Defendants.
11    _____
12              VIDEOCONFERENCE DEPOSITION OF
13                     JUDITH BRENER
14    DATE:         Tuesday, October 5, 2021
15    TIME:         10:10 a.m.
16    LOCATION:     Remote Proceeding
17                  New York, NY 10001
18    REPORTED BY:  David Rubenstein, Notary Public
```

Page 2

1  A P P E A R A N C E S
2  ON BEHALF OF PLAINTIFF JEFFREY M. GOLDMAN:
3    D. MAIMON KIRSCHENBAUM, ESQUIRE
4    (by videoconference)
5    Joseph & Kirschenbaum, LLP
6    32 Broadway, Suite 601
7    New York, NY 10004
8    (212) 688-5640
9
10   LEAH SELIGER, ESQUIRE (by videoconference)
11   Joseph & Kirschenbaum, LLP
12   32 Broadway, Suite 601
13   New York, NY 10004
14   leah@jk-llp.com
15   (212) 688-5640
16
17 ON BEHALF OF DEFENDANTS SOL GOLDMAN INVESTMENTS LLC,
18 SOLIL MANAGEMENT, LLC AND JANE H. GOLDMAN:
19   JOSHUA S. BAUCHNER, ESQUIRE
20   (by videoconference)
21   Ansell Grimm & Aaron
22   365 Rifle Camp Road
23   Woodland Park, NJ 07424
24   jb@ansellgrimm.com
25

Page 3

1    A P P E A R A N C E S (Cont'd)
2  ALSO PRESENT:
3    Jeffrey M. Goldman, Plaintiff
4    (by videoconference)
5    Arina Malhotra, Counsel (by videoconference)

Page 4

1            I N D E X
2  EXAMINATION:                    PAGE
3    By Mr. Kirschenbaum            7
4
5            E X H I B I T S
6  NO.      DESCRIPTION            PAGE
7              MARKED
8  Exhibit 15    Emails              54
9
10     (Exhibits retained by counsel.)
11
12         PREVIOUSLY MARKED
13 Exhibit 1     DEF131859-DEF131864    22
14 Exhibit 5     DEF5077 Email          30
15
16     (Exhibits retained by counsel.)
17
18    QUESTIONS INSTRUCTED NOT TO ANSWER
19        PAGE       LINE
20         57          7

Page 5

1                J. BRENER
2         REPORTER: Good morning. My name is
3  David Rubenstein; I am the officer assigned by
4  Veritext to take the Zoom record of this proceeding.
5  I am a notary authorized to take acknowledgements and
6  administer oaths in New York State. We are now on the
7  record.
8         This is the deposition of Judith Brener
9  taken in the matter of Jeffrey M. Goldman vs. SOL
10 Goldman Investments LLC, Solil Management, LLC and
11 Jane H. Goldman at 10:10 a.m. on Tuesday, October 5,
12 2021, at a remote proceeding.
13         Due to the pandemic and out of concern
14 for public and participant safety, parties agree that
15 I will swear in the witness remotely outside of his or
16 her presence.
17         Additionally, absent an objection on
18 the record before the witness is sworn, all parties
19 and the witness understand and agree that any
20 certified transcript produced from the recording of
21 this proceeding:
22         - is intended for all uses permitted
23           under applicable procedural and
24           evidentiary rules and laws in the same
25           manner as a deposition recorded by

Page 6

J. BRENER

1   J. BRENER
2   stenographic means; and
3   - shall constitute written stipulation
4   of such.
5          At this time will everyone appearing
6   remotely please identify yourself for the record.
7          MR. KIRSCHENBAUM: This is Maimon
8   Kirschenbaum. I'm here representing plaintiff Jeff
9   Goldman.
10         MS. SELIGER: Leah Seliger,
11  representing plaintiff Jeff Goldman.
12         MR. KIRSCHENBAUM: Jeff? Jeff, you're
13  on mute.
14         MR. GOLDMAN: Plaintiff Jeffrey
15  Goldman.
16         MR. BAUCHNER: Good morning. Joshua
17  Bauchner from the law firm Ansell Grimm & Aaron for
18  defendants. With me is the witness, Judy Brener, and
19  Counsel Arina Malhotra, M-A-L-H-O-T-R-A.
20         MR. KIRSCHENBAUM: Jeff, if you could
21  put your thing back on mute.
22         REPORTER: Thank you. All right.
23  Hearing no objection, I will now swear in the witness.
24         If you can, please raise your right
25  hand, Ms. Brener.

Page 7

J. BRENER

2   WHEREUPON,
3          JUDITH BRENER,
4   called as a witness, and having been first duly sworn
5   to tell the truth, the whole truth and nothing but the
6   truth, was examined and testified as follows:
7          REPORTER: Okay. You may put your hand
8   down.
9          Your witness, Counsel.
10            EXAMINATION
11  BY MR. KIRSCHENBAUM:
12    Q   Okay. Good morning, Ms. Brener.
13    A   Good morning.
14    Q   Just to get a couple of big basic things out
15  of the way, just to be clear, in your room with you is
16  two lawyers. Right -- Maria and Josh Bauchner?
17    A   Maria?
18         MR. BAUCHNER: No, it's Arina.
19         MR. KIRSCHENBAUM: I'm sorry. Arina.
20  I can't hear it perfectly clearly.
21  BY MR. KIRSCHENBAUM:
22    Q   Arina and Josh Bauchner. Is that correct,
23  Ms. Brener?
24    A   Yes.
25    Q   Is there anyone else in the room with you?

Page 8

J. BRENER

1   J. BRENER
2   A   No.
3   Q   Okay. Have you ever been deposed before?
4   A   Yes.
5   Q   And you're an attorney yourself. Correct?
6   A   Yes.
7   Q   So I take it you're somewhat familiar with
8   the rules of a deposition?
9   A   Somewhat. I haven't been deposed in a very
10  long time, so feel free to educate me.
11  Q   Well, just in general, it's important that
12  you give verbal answers to the question I ask so the
13  court reporter can get them down. Do you understand
14  that?
15  A   Yes.
16  Q   And if your attorney objects, that objection
17  is typically for the record. You can still answer the
18  question unless he instructs you specifically not to
19  object -- not to answer. Do you understand that?
20  A   I will follow his instructions, yes.
21  Q   Is there any reason that you would be
22  impaired from testifying truthfully today?
23  A   No.
24  Q   Are you taking any medication that impairs
25  your memory?

Page 9

J. BRENER

2   A   No.
3   Q   It's my understanding that in addition to
4   testifying in your individual capacity, you've also
5   been designated as the corporate witness for Sol
6   Goldman Investments LLC and Solil Management, LLC. Is
7   that your understanding?
8   A   Yes.
9   Q   Do you hold a title at Sol Goldman
10  Investments LLC?
11  A   I am employed by Solil Management. I'm the
12  general counsel for -- under Solil Management, and
13  that would extend to various holding companies and
14  other entities.
15  Q   Okay. Is Sol Goldman Investments LLC a
16  holding company to the best of your understanding?
17  A   Yes.
18  Q   And what does it hold?
19  A   Various properties which -- each is under an
20  LLC.
21  Q   So are you saying that each property is
22  separately incorporated as its own LLC; is that
23  correct?
24         MR. BAUCHNER: Objection to form.
25  A   Each property is in its own LLC -- is owned

3 (Pages 6 - 9)

|  |  |
|---|---|
| Page 10<br>1  J. BRENER<br>2  by an LLC, an individual LLC.<br>3  Q  And then, all or many of those LLCs are held<br>4  by Sol Goldman Investments LLC.  Is that correct?<br>5       MR. BAUCHMAN:  Objection to form.<br>6  A  Or -- yeah, yes.<br>7  Q  And does Solil Management, LLC manage those<br>8  properties?<br>9       MR. BAUCHMAN:  Objection to form.<br>10  Which properties?<br>11       MR. KIRSCHENBAUM:  The properties that<br>12  are separately incorporated as LLCs and held by Sol<br>13  Goldman Investments LLC.<br>14       MR. BAUCHMAN:  Right.  But your prior<br>15  question was a compound question when you said "or."<br>16       MR. KIRSCHENBAUM:  I understand.  You<br>17  can object to form.<br>18       MR. BAUCHMAN:  I did, but you're now --<br>19  your next question, as a result of that objectionable<br>20  question, makes no sense, because they're not all<br>21  under SGI.<br>22       MR. KIRSCHENBAUM:  I didn't say they<br>23  were all, I said --<br>24       MR. BAUCHMAN:  You did.<br>25       MR. KIRSCHENBAUM:  -- I said "all or | Page 12<br>1  J. BRENER<br>2  BY MR. KIRSCHENBAUM:<br>3  Q  Going back, is it, in fact, the case that<br>4  many properties that are separately incorporated as<br>5  LLCs are held by Sol Goldman Investments LLC?<br>6  A  Yes.<br>7  Q  And are those properties managed by Solil<br>8  Management, LLC?<br>9  A  Yes, that would be the property manager --<br>10  management company.<br>11  Q  So is it the case that Solil Management, LLC<br>12  manages the properties that are owned indirectly by<br>13  Sol Goldman Investments LLC?<br>14       MR. BAUCHNER:  Objection.  Form.<br>15  A  Solil Management is the property management<br>16  company for these various properties that are held<br>17  under SGI, as we call it -- Sol Goldman Investments.<br>18  Q  And you were the general counsel of Solil<br>19  Management, LLC.  Is that correct?<br>20  A  Yes.<br>21  Q  And Jeff Goldman was an attorney that was<br>22  employed by Solil Management, LLC.  Is that correct?<br>23  A  Yes.<br>24  Q  And in that capacity, did Jeff Goldman<br>25  perform legal work that related to management of the |
| Page 11<br>1  J. BRENER<br>2  many."<br>3       MR. BAUCHMAN:  Exactly right.  And the<br>4  "all or many" is what makes it a compound question and<br>5  objectionable.  I want to be clear that Solil<br>6  Management does much more than just what you're<br>7  describing, and we need to --<br>8       MR. KIRSCHENBAUM:  Okay.  I'm going to<br>9  ask you not to engage in speaking objections.<br>10       MR. BAUCHMAN:  And I'm going to ask you<br>11  not to ask compound questions.<br>12       MR. KIRSCHENBAUM:  Right.  There's a<br>13  way to ask me that.  It's called saying the words,<br>14  "Objection as to form."<br>15       MR. BAUCHMAN:  And I did, and you<br>16  continued.<br>17       MR. KIRSCHENBAUM:  I understand.<br>18  You've objected --<br>19       MR. BAUCHNER:  Don't --<br>20       MR. KIRSCHENBAUM:  You've objected as<br>21  to form --<br>22       MR. BAUCHNER:  Let's proceed,<br>23  Mr. Kirschenbaum.  Please ask careful questions.<br>24       MR. KIRSCHENBAUM:  Okay.  Thank you.<br>25  // | Page 13<br>1  J. BRENER<br>2  properties that were held by Sol Goldman Investments<br>3  LLC?<br>4  A  Well, he was employed by Solil Management,<br>5  and Solil Management was the property manager for the<br>6  various properties.  So indirectly, he had<br>7  responsibility to represent Sol Goldman Investments<br>8  and the individual LLC.  That was his duty under Solil<br>9  as part of the team of Solil Management, the property<br>10  manager.<br>11  Q  And to the best of your knowledge, is there<br>12  a president of Sol Goldman Investments LLC?<br>13       MR. BAUCHNER:  Objection.<br>14  A  An LLC doesn't necessarily have officers.<br>15  There are -- Sol Goldman Investments is an LLC.  That<br>16  -- that should answer.<br>17  Q  Is there a chief decision-maker for Sol<br>18  Goldman Investments LLC?<br>19       MR. BAUCHNER:  Objection to form.<br>20  A  You can see the -- I -- I believe we have<br>21  produced the -- the limited liability company<br>22  agreement for Sol Goldman Investments, and the<br>23  structure is set out there.<br>24  Q  Right.  But I -- and I'm asking you as<br>25  testimony, not -- in other words, I do have the |

Page 14

1           J. BRENER
2  documents that I have, but now I'm taking the
3  deposition.  So the question is: Is there a chief
4  decision-maker at Sol Goldman Investments LLC?
5           MR. BAUCHNER:  Objection to form.  What
6  do you mean by "chief decision-maker"?  It's an LLC.
7  It doesn't have officers.  So --
8           MR. KIRSCHENBAUM:  Excuse me, please.
9  That's a speaking objection.
10          Ms. Brener, if at any time you don't
11 understand my question, you can ask me to explain
12 myself.
13          THE WITNESS:  Okay.  Please explain
14 what you're -- what you're trying to get at here.
15 BY MR. KIRSCHENBAUM:
16    Q   You've stated that Solil Management, LLC
17 manages properties on behalf of Sol Goldman
18 Investments LLC.  Is that correct?
19          MR. BAUCHNER:  Objection to form.
20 Mischaracterizes testimony.
21          MR. KIRSCHENBAUM:  I said, "Is that
22 correct?"
23 BY MR. KIRSCHENBAUM:
24    Q   Is that correct, Ms. Brener?
25    A   Some of the properties are held by SGI.  To

Page 15

1           J. BRENER
2  the extent they're held by SGI, Solil Management is a
3  property manager for those properties, employing
4  employees in our office and outside our office.
5     Q   By SGI, you're referring to Sol Goldman
6  Investments LLC.  Correct?
7     A   I'm referring to Solil Management's
8  responsibility to provide management services for Sol
9  Goldman Investments.
10    Q   And my question is: Does someone at SGI
11 communicate with Solil and tell them what SGI's desire
12 is with respect to the management of the property?
13          MR. BAUCHNER:  Objection to form.
14    A   Yes.
15    Q   And is Jane Goldman one such person?
16    A   Yes.
17    Q   And what is her position at SGI, if any?
18    A   Well, as noted in the limited liability
19 agreement, she is a manager.
20    Q   She's a manager at SGI.  Is that correct?
21    A   Yes.
22    Q   And she can make management decisions at
23 SGI.  Is that correct?
24          MR. BAUCHNER:  Objection to form.
25    A   Yes.

Page 16

1           J. BRENER
2     Q   And does she communicate such decisions to
3  Solil Management?
4     A   In her capacity as a manager of SGI, yes.
5     Q   Okay.  Does Solil Management manage
6  properties that are not owned -- I'm sorry.  Strike
7  the question.  There are some properties that Solil
8  Management manages that are not indirectly held by
9  SGI.  Is that correct?
10    A   Yes.
11    Q   And are those properties owned either
12 directly or indirectly by Jane Goldman?
13          MR. BAUCHNER:  Objection to form.
14 Compound question.  Please rephrase.  Please rephrase
15 your question.
16    Q   Are those properties owned in any capacity
17 by Jane Goldman?
18    A   Which properties are you referring to?
19    Q   The properties that Solil Management manages
20 that are not owned by SGI.
21          MR. BAUCHNER:  Objection to form.
22          You can answer if you understand.  I
23 certainly don't.
24    A   Are they owned under an LLC?  I'm not
25 exactly sure what you're saying.  Does she

Page 17

1           J. BRENER
2  individually own these properties?  This is -- no, she
3  doesn't individually own properties.
4     Q   They're owned by LLCs.  Correct?
5     A   Yes.
6     Q   And is Jane a member of those LLCs, to your
7  understanding?
8     A   No.  The member -- no, I don't think she is,
9  in her individual capacity, a member of those LLCs
10 that own the individual property.
11    Q   Is she indirectly a member of those LLCs?
12          MR. BAUCHNER:  Objection to form.
13    A   I don't know what that means, "Is she
14 indirectly" -- I don't know.  I don't know what that
15 means.
16    Q   Is she, for example, part of a trust that
17 owns those LLCs?
18          MR. BAUCHNER:  Objection to form.
19    A   I -- I don't understand what you're saying.
20 Is she part of a trust that -- I -- I don't understand
21 what you're -- what you're saying.  They're LLCs that
22 own the properties individually.
23    Q   Okay.  Who is the chief decision-maker at
24 Solil Management, LLC?
25          MR. BAUCHNER:  Objection to form.

5 (Pages 14 - 17)

Page 18

J. BRENER

1
2  You can answer in you understand.
3  A  Chief decision-maker -- Jane Goldman is the
4  -- is in the office, and she has siblings who also
5  have to weigh in on major decisions, certainly.
6  Q  Is Jane Goldman an active manager at Solil
7  Management, LLC in the day to day?
8     MR. BAUCHNER:  Objection to form.
9  A  Yes.
10  Q  So just to make sure --
11  A  There are other entities.  There are other
12  -- other layers, but yes, she -- she is a
13  decision-maker.
14  Q  So if I understand correctly, Solil
15  Management operates both properties that are owned by
16  SGI LLC indirectly and also some set of other
17  properties that are not owned by SGI.  Is that
18  correct?
19     MR. BAUCHNER:  Objection to form.
20  Solil Management doesn't operate anything.  It's a
21  management company.
22     MR. KIRSCHENBAUM:  Please do not
23  testify.
24     THE WITNESS:  Solil Management is the
25  property management company for -- yeah.

Page 19

J. BRENER

1
2     MR. BAUCHNER:  Please don't interrupt
3  the witness.
4  BY MR. KIRSCHENBAUM:
5  Q  I'm sorry.  I didn't realize you were still
6  going.  You can continue.
7  A  For all the properties.
8  Q  And by all the properties, if I understood
9  what you were saying correctly, that includes
10  properties that are owned by SGI and some properties
11  that are not owned by SGI.  Is that correct?
12  A  Properties -- all the properties.  To be
13  clear, all the properties are owned in separate LLCs,
14  as we've discussed, so --
15  Q  Right.  But --
16  A  Go ahead.
17  Q  No, you can continue.
18  A  No, that's it.  Go ahead.
19  Q  But there are properties that are owned
20  indirectly by SGI, and then there are properties
21  managed by Solil that are not owned indirectly by SGI.
22  Is that correct?
23     MR. BAUCHNER:  Objection to form.
24     You can answer if you understand
25  "indirectly."

Page 20

J. BRENER

1
2  Q  I can explain what I mean by "indirectly,"
3  if you want me to.  I think you understand it.
4  A  I don't -- you know, I want to be clear
5  here.  Each property is in its own LLC.  So that --
6  that has to be clear.  Some of the properties are in
7  the SGI holding group, and those are -- since you have
8  the SGI -- the Sol Goldman Investment limited
9  liability company agreement, you have a list of those
10  properties.
11  Q  Okay.  So you've just identified a group of
12  properties called "properties that are in the SGI
13  holding group."  Correct?
14  A  Yes.
15  Q  Yeah, SGIs.  All I'm trying to establish is
16  the simple fact that Solil Management manages both
17  properties that are in the SGI holding group and
18  properties that are not in the SGI holding group.
19  A  Yes.
20  Q  That's correct.  And for the properties --
21  I'm sorry.  Strike that.  Do you have a sense of what
22  percent of the properties managed by Solil Management,
23  LLC are in the SGI holding group?
24     MR. BAUCHNER:  Objection to form.
25  A  No, I don't.

Page 21

J. BRENER

1
2  Q  Do you have a sense of if it's more or less
3  than half?
4     MR. BAUCHNER:  Objection to form.
5  A  I don't.
6  Q  So it could be half?
7     MR. BAUCHNER:  Objection to form.
8  Calls for speculation.
9  A  It could be.
10  Q  Could it be more than half?
11     MR. BAUCHNER:  Objection to form.
12  Calls for speculation.
13  A  Since I don't -- since I don't know, I would
14  just be, you know, guessing.
15  Q  Well, you are the 30(b)(6) witness for SGI
16  and Solil.
17     MR. BAUCHNER:  And in that capacity,
18  she's not required to guess.
19  Q  Right.  I'm not asking you to guess.  I'm
20  asking you based on your knowledge in those
21  capacities.  Do you have a sense of whether it's about
22  half?
23     MR. BAUCHNER:  Objection to form.
24  Calls for speculation.  The witness has already
25  answered.

Page 22

J. BRENER

 2   Q   I'm not asking you to speculate.
 3   A   I don't know, so it's very hard for me to
 4  tell you.  It's -- it's certainly more than 10
 5  percent, probably more than 20 percent.  Beyond that,
 6  I really can't give you -- give you an answer.
 7   Q   Okay.  And with respect to the properties
 8  that are not in the SGI holding group, are those
 9  properties also under the control of the Goldman
10  family to the best of your knowledge?
11         MR. BAUCHNER:  Objection to form.
12         You can answer if you understand.
13   A   That's too broad a statement.  I don't know
14  what you mean by "the Goldman family."  I don't know
15  which particular people you're talking about.  I would
16  like some clarification.
17   Q   Does SGI LLC -- I'm sorry.  Strike that.
18  Are there properties in the SGI LLC holding group that
19  are not managed by Solil Management, LLC?
20   A   No, I don't -- no.
21   Q   Okay.  I'd like to pull up Exhibit 1.  Now,
22  I understand that you have it in front of you.  I'm
23  happy to put it on the share screen if --
24         (Exhibit 1 was previously marked for
25          identification.)

Page 23

J. BRENER

 2   A   No, it's all right.  I -- I do have it,
 3  yeah.  I have it.
 4   Q   You have Exhibit 1 in front of you?
 5   A   Yeah.
 6   Q   And I'd like for you to turn to the fifth
 7  page of that exhibit.
 8         MR. BAUCHNER:  For the record --
 9   Q   I'm sorry.  Strike that.  Exhibit 1 was
10  produced by SGI's lawyers, and scrolling through the
11  third page of Exhibit 1, which starts with DEF131860,
12  and going through until DEF131864, is what I'm
13  pointing your attention to right now.  Do you see
14  those documents?
15         MR. BAUCHNER:  Objection.  For the
16  record, Exhibit 1 was produced by Solil Management,
17  LLC, not by SGI.
18   Q   Do you see that -- those five pages?
19   A   I see the pages.
20   Q   Okay.  And I'm sorry.  The first set of --
21  it should be six pages, DEF131859.
22   A   Okay.
23   Q   And this appears to be a submission by Solil
24  to the Department of Labor with respect to Jeff
25  Goldman's request for unemployment benefits.  Is that

Page 24

J. BRENER

 2  your understanding of what it is?
 3   A   Yes.
 4   Q   Okay.  And turning your attention to page
 5  five of that document, which is Bates-stamped, in the
 6  corner, 131862.
 7   A   Yes.
 8   Q   It appears that this document was completed
 9  by you and signed by you.  Is that accurate?
10   A   Yeah, on behalf of Solil Management.
11   Q   On behalf of Solil Management, yes, but
12  you're the one who filled it out.  Correct?
13   A   Yes.
14   Q   And turning to the next page, the document
15  131863, do you see that?
16   A   Yes.
17   Q   And it states in the corner, "supplement to
18  unemployment insurance notice of protest."  Is this
19  something that you submitted together with the prior
20  pages?
21   A   Yes.  I'm not the one that faxed it.  I
22  think it was faxed.  I, myself, did not fax it.
23   Q   But did you prepare it?
24   A   Yes.
25   Q   Okay.  In the first full paragraph of that

Page 25

J. BRENER

 2  document, I want to point your attention to the third
 3  sentence.  The sentence reads, "Mr. Goldman was paid
 4  during the months he was expected to work remotely.
 5  However, his duties, by and large, did not lend
 6  themselves to remote work."  What did you mean when
 7  you said his "duties, by and large, did not lend
 8  themselves to remote work"?
 9   A   Well, Jeff Goldman was the lead trial
10  counsel.  He was our in-court person, and his duties
11  really were to go to court on most of the court
12  appearances that most were -- many times, it was
13  daily.  And -- and he also had institutional knowledge
14  so he could be able to share that with other
15  employees.
16         We're a collaborative office.  Our files are
17  in the office, and I think it was difficult to really
18  effectively work remotely for many people in the
19  office because of the nature of our -- the nature of
20  our business.  We are paper-centric.  We have paper
21  files.  It's very necessary to pull multiple files
22  multiple times a day, depending on what you're working
23  on.
24         And Jeff, in particular, was the court
25  attorney, so he was not as proficient as others would

7 (Pages 22 - 25)

Page 26

J. BRENER

be in -- in the office at producing, writing, and -- and memos, and -- and memos of law. And he relied on others for a lot of the writing, and it was to be expected, because he was in court, and that was -- he took charge on everything, he knew all the court systems, and he represented Solil Management and the various subentities in cases, nonprimary in other cases, and that was his primary responsibility.

Q  So if Mr. Goldman's court appearances were remote, then wouldn't it be the case that he could appear remotely from his home?

MR. BAUCHNER: Objection to form. Calls for speculation.

A  Well, to the extent he could appear remotely, he could appear remotely, but part of -- part of what his function was, was to mentor, to share institutional knowledge, to be a presence in the office so that we could be a collaborative office. We're also a real estate company, and we had managed, over the three months, to make our office safe. And we followed every protocol and went beyond, and we're still beyond.

We've mandated everybody's vaccinated. We mandate mask-wearing in all public areas, and we had a

Page 27

J. BRENER

-- and -- and SL Green, the building, they had HEPA filters, and they had extreme measures in terms of -- of filtration systems that they upgraded. You had very few people in the building. You had your own elevator. It -- there was a real safety protocol.

We had plexiglass in various places. We had directional signs. We had alcohol distributed, masks distributed, gloves distributed, and cleaning -- extra cleaning of the offices. So we -- we created that environment here so that we could be a collaborative office and so that those who were more senior, in terms of longevity in the office, could share their institutional knowledge.

Jane Goldman was here everyday. I was here everyday. We had others who were here everyday. And -- and, you know, while part of Jeff's was remote, as the courts opened, we did have an in-court appearance -- at least one in-court appearance -- but to the extent you could do it -- you could appear remotely, those cases, there were not many remote court appearances.

So the function during that period of time that we would have expected Jeff to perform would have been the collaborative function. The function of

Page 28

J. BRENER

mentoring. The function of working with others on advising -- working with others on their work and advising them and being -- being a leader in the office.

Q  Are you aware of any in-person court appearance in June of 2021 that Jeff Goldman was supposed to have attended?

MR. BAUCHNER: Objection to form.

A  No.

Q  Are you aware of any in-person court appearances that were scheduled and that Mr. Goldman would have had to appear in person for after June of 2021?

A  Any time after?

Q  Yeah.

A  We did have -- we did have a -- an in-person court appearance.

Q  My question is -- okay. Mr. Goldman's employment ended on June 24, 2020. Is that right?

A  Well, he effectively resigned and, you know, left -- left the -- decided not to come back.

Q  On that date or that week, June 24th of 2020?

A  Yes, yes, around that date.

Page 29

J. BRENER

Q  And at that time, was there an in-person court appearance that you know of that Mr. Goldman was scheduled to have attended?

A  In June, no.

Q  Was there a specific court appearance that you were concerned Mr. Goldman would miss during that week of June 2020?

A  During that week, no.

Q  Sitting here today, is there a specific court appearance -- I'm sorry. Strike that question. Going back to the exhibit we were reading, the supplement to the unemployment insurance notice of protest that we were reading from a few moments ago --

A  Yes.

Q  Okay. The next -- I'm looking at the second to last sentence of the first paragraph, which reads, "Mr. Goldman's only notification, which was sent by email on June 17th a few days before the office reopened, wherein he stated that he would not be returning either to the office or to court, without giving any indication of any time period during which he would be absent from both." Do you see that?

A  Yes.

Q  And you refer to an email in that sentence.

Page 38

1                J. BRENER
2  people who worked part-time. Kathleen Leeks, who
3  herself is in her -- you know, in her mid-80s, she was
4  here during her days. We made sure she had a private
5  office. We made sure that people were in any office
6  that was available, any conference room that was
7  available, and we added extra filtration in the
8  offices, a -- a standing filtration system, in
9  addition to what SL Green provided.
10      So you could take the elevator all by
11 yourself. You could park a block away from this
12 office, walk to the office, come in, have your
13 temperature taken, come up, and there was Purell
14 everywhere or something like it everywhere,
15 downstairs, upstairs. You know, gloves were given out
16 daily. Masks were given out daily. Alcohol was given
17 out daily. We created an environment that has proven
18 -- that was safe, that was -- exceeded all protocols,
19 was safe, and has proven to be safe.
20      Q   After receiving Mr. Goldman's email on June
21 17, did you interact with him about how Solil might
22 accommodate his need to work from home?
23          MR. BAUCHNER: Objection to form. The
24 witness just testified he didn't return her call.
25      A   He didn't request an accommodation, and he

Page 39

1                J. BRENER
2  did not return my call, and he didn't email me and
3  say, "You know, I'd like to this, that, or the other.
4  I think I have to for this period of time," or
5  anything else. He would not engage. He shot -- sent
6  out his email and hit retract and hid from me. That's
7  how I perceived it. I went to Jane Goldman. I said,
8  "I can't get in touch with him. He's not responsive,"
9  so she picked up the phone and called him.
10      Q   When you emailed Jeff on the 17th saying,
11 "Please send the doctor's note," he did respond by
12 sending you the doctor's note. Isn't that correct?
13      A   Yes, he shot a doctor's note -- that was
14 dated June 3rd. A doctor's note -- so he had already
15 planned it, while we're planning to open the office,
16 without giving us the respect of additional notice.
17 He worked here for 20 years. If he wanted to say,
18 "I'm not working there anymore," anybody who's
19 quitting, who is retiring, who is not coming in, gives
20 us the respect.
21          Anybody who's worked here three -- three
22 years gives us the respect to tell us so we can
23 arrange what we have to arrange when somebody is no
24 longer working here. So he didn't give us that
25 respect. He made his plans. He was sitting at home

Page 40

1                J. BRENER
2  making his plan not to come back to get his stuff in
3  order, get a little doctor's note here, shoot
4  something to Concetta and Judy, leave Jane out of it,
5  see if he can test the waters, not be open, not be
6  forthright, and should have been.
7           Anybody with any respect for the place he
8  worked for 20 years would have called first and said,
9  "These are my concerns." He did nothing. He told us
10 what he was doing without question, without asking us,
11 without any discussion whatsoever, with a little
12 doctor's note.
13      Q   Did you email Mr. Goldman to discuss how
14 Solil might accommodate his need to work from home?
15      A   He --
16          MR. BAUCHNER: Objection. Asked and
17 answered.
18      Q   I'm sorry. What's the answer to the
19 question?
20      A   The answer to the question is: He didn't ask
21 for any accommodation whatsoever. He did not. He
22 told us what he was doing, period. He didn't say,
23 "Oh, well, you know, what I'd like to do for a period
24 of time" -- no time limit, no nothing, no discussion
25 of when or how. I understand that during this period

Page 41

1                J. BRENER
2  he'd been swimming without a mask. He's walking
3  through the park without a mask, but no, he cannot
4  come into the office.
5           The office is much safer than a swimming --
6  public swimming pool where people are swimming without
7  masks. I don't care if you're in your own lane, or
8  you're sharing a lane, or whatever you're doing. You
9  are in a public place, and believe me, they don't have
10 the protocols that we have, and you're -- and you
11 don't have a mask. Here, we are masked. You walk
12 around --  nobody walks around this office unmasked,
13 period.
14          You're -- you're in your office, take off
15 your mask. Somebody walks in, put your mask on. Make
16 sure you have six to ten to twelve feet distance. So
17 we have created an environment that's completely safe,
18 and Jeffrey Goldman didn't ask us anything. He made a
19 decision, and he thrust it upon the employees without
20 even telling -- without even telling who he reported
21 to, Jane Goldman, who was his boss, and he -- who he
22 knew he had to answer to.
23      Q   So just so I understand correctly, is it
24 your testimony that Mr. Goldman did not ask for an
25 accommodation?

Page 42

J. BRENER

2  A   That is correct.
3  Q   And that is why you did not discuss with him
4  an accommodation.  Is that correct?
5  A   I didn't discuss it because he didn't call
6  me.  I had no conversations with him.  He was hiding
7  from me.  He had like -- he wasn't going to answer.
8  He just didn't engage with me.
9  Q   To your knowledge, did anyone at Solil
10 discuss with Mr. Goldman an accommodation?
11 A   He didn't ask for one, so who's going to
12 ask?  He didn't ask for any accommodation.  He told us
13 what he was doing, so to my knowledge, he wanted to be
14 terminated so he could collect unemployment.  That was
15 the gameplan.
16     "Let me get a little doctor's note here.
17 Let me call my doctor, get a doctor's note.  I'll hold
18 onto it.  I won't give the company the respect of
19 telling them what my plans are, the respect of a
20 discussion to see if there's anything we can do.  I
21 won't do that.  Instead, what I'm going to do is, I'm
22 going to get a doctor's note on June 3rd when we've
23 started discussing on our conversation," you know,
24 whether we're going to try to open the office as soon
25 as it's -- we have our safety measures in place, until

Page 43

J. BRENER

2  there's a government allowance, and we expect people
3  to -- can have staggered hours, and we had other, you
4  know -- you know, making some sort of way to keep us
5  as safe as we could possibly be.
6      And it's much safer than going to a public
7  pool.  Being in our office has so many layers of
8  safety measures, and the truth is that nobody
9  contracted it from one to the other, period.  I think
10 what we did here created a completely safe
11 environment.  I think Jeff made his own plan to -- to
12 do what he wanted to do very quietly, very slyly --
13 get a letter June 3rd, disrespect everybody --
14 everybody who works here, because we're a
15 collaborative office.
16     We rely on each here, and Jeff was a senior
17 person.  We relied on him.  We relied on him for
18 certain things.  We relied on him for his
19 institutional knowledge, for -- for his knowledge of
20 the judges, for his knowledge of the court system.  We
21 relied on him.  No, he was -- he was telling us what
22 he was going to do without discussion, without the
23 courtesy.
24     After 20 years of being paid a nice salary
25 with other perks, he decided he is going to do it his

Page 44

J. BRENER

2  way, get a little note from his doctor, who will be
3  deposed, and just continue to do what he decided he
4  was going to do -- thrust it on the employer.  And
5  that is unacceptable, and it's not -- it's not any
6  request for any accommodation, not -- it's not an
7  engagement.  It's not a discussion.
8  Q   So to the best of your understanding, is it,
9  in fact, the case that nobody at Solil discussed with
10 Mr. Goldman an accommodation?  I understand --
11 A   He didn't ask for one --
12 Q   I understand that you said that he didn't
13 ask for one, and so as a result, nobody discussed an
14 accommodation with him.  Is that correct?
15 A   I don't know.  I don't know who he talked to
16 other than Jane Goldman.  He wouldn't talk to me,
17 because I called him.  He wouldn't even pick up the
18 phone, so I -- I don't know who he spoke to.  I can't
19 even answer that.
20 Q   Do you know if Solil has any record of a
21 discussion with anyone at Solil and Mr. Goldman about
22 an accommodation?
23     MR. BAUCHNER:  Objection to form.  I'm
24 going to stop this.  She said he never requested one.
25     MR. KIRSCHENBAUM:  I'm asking if

Page 45

J. BRENER

2  there's a record.  Please don't testify --
3     MR. BAUCHNER:  I'm not going to allow
4  you to -- this is the way you stop it.  This is
5  ridiculous.  It's the same question.
6     MR. KIRSCHENBAUM:  No, I am asking
7  you --
8     MR. BAUCHNER:  He never asked for
9  accommodations, so there could be no discussion
10 because he didn't request one, and he didn't engage --
11    MR. KIRSCHENBAUM:  Okay.  That's a
12 speaking objection.  It's okay.  I understand.  Your
13 objection is noted, and now, I'm going to ask my
14 question.
15 BY MR. KIRSCHENBAUM:
16 Q   Ms. Brener, is it in fact the case that
17 there is no record of a discussion between Solil and
18 Mr. Goldman about an accommodation?
19     MR. BAUCHNER:  Objection.
20     Do you have anything to add to your
21 answer, Ms. Brener?
22 A   He didn't request an accommodation.
23 Q   And so therefore, there is no record.  Is
24 that correct?
25     MR. BAUCHNER:  Objection to form.

12 (Pages 42 - 45)

Page 46

J. BRENER

    Do you have anything to add to your
answer?
 Q   Is that correct?
 A   He didn't ask for any accommodation, so I
have no record of any request for any accommodation.
And I think you have -- I think you have his
performance file, and he did not make any requests to
anybody. The HR person, Debbie Alexander, he didn't
talk to her. He didn't send her anything. He sent me
an email and Concetta Ferrari, the office manager, hid
from everybody else and hid from me and was so
disrespectful in not letting us know what his plans
were -- what his -- anything that he wanted to do.
    June 3rd, he's planning and plotting, and
probably before that, because I'm sure the doctor
didn't give him -- do him the favor of the little note
exactly the moment he requested it. I'm sure this is
a plan and a plot and a plan, and without -- he does
not say he's ever coming back to work in the office or
in court. He gives us no indication and won't engage,
period. I hope that's clear.
 Q   You mentioned that you called Jeff, and he
didn't pick up. Is that right?
 A   I know I called him because I had on an

Page 47

J. BRENER
email, "I called you." I don't -- I -- I know I
called him, therefore, but I don't have the specific
-- a specific recollection of leaving a message or
anything. I know I couldn't connect with him by
phone.
 Q   Do you remember if that telephone call was
before Mr. Goldman spoke with Jane Goldman or after?
 A   Yes, that -- I called before, and I told
Jane, "I can't get in touch with him. He's really not
responsive to me," and she says, "Let me call him.
He'll pick up the phone." She -- she didn't even
understand why he didn't -- why he didn't engage with
her, why he didn't tell her that he wasn't coming
back. And he knew who to tell, and he testified and
put in his complaint, oh, well, he served at the whim
of Jane Goldman.
    This is -- you know what? For somebody
who's worked somewhere for 20 years to treat the
people and the owners who he worked for, the manager,
in this -- just the -- with this disregard and with no
-- with no appreciation for anything that was done for
him, it goes way above and beyond his rich salary,
which he -- I know that's why he was here, because he
said, "I have a great salary," so great, but he did

Page 48

J. BRENER
nobody any respect when he wanted and he saw an
opportunity for himself to, as he said, "Fire me so I
can collect unemployment." That was the game.
    MR. BAUCHNER: We need to go off the
record, the court is calling back.
    REPORTER: Off the record at 11:09 a.m.
    (Off the record.)
    MR. BAUCHNER: -- deposition,
Mr. Kirschenbaum indicated that plaintiff Mr. Goldman
would not be appearing by video. Apparently, and
considering Mr. Goldman has been on video, but the
judge did call back, and she instructed and asked that
I put it on the record that everyone is to appear by
video if they're going to be attending this deposition
without exception, that the video will not be used in
the court proceeding, but that everyone must have
their camera turned on if they are going to appear at
this deposition.
    So I appreciate that Counsel and
Plaintiff abided by that instruction in depo, but
since we unfortunately involved the court, it is
requested that I put it on the record. Thank you.
    MR. KIRSCHENBAUM: Mr. Rubenstein, are
we back on the record with the witness?

Page 49

J. BRENER
    REPORTER: Yeah, we are back on the
record.
BY MR. KIRSCHENBAUM:
 Q   Ms. Brener, you said earlier that you
emailed Jane to tell her that you couldn't get through
to Jeff, and then she called him.
 A   I don't -- I don't believe I said that.
 Q   Okay. I'm sorry. Was it something
different than that?
 A   I didn't say I emailed her.
 Q   You just told her?
 A   I believe so.
 Q   Do you have any record of your calls to Jeff
that he didn't respond to?
    MR. BAUCHNER: Objection. The witness
has testified she had an email.
 A   There's an email where I said, "I tried to
call you," as the caption.
 Q   An email from you to Jeff. Is that what
you're referring to?
 A   Yeah.
 Q   Other than that email --
 A   It's part of the discovery.
 Q   Other than that email from you to Jeff, is