# Exhibit D

1

```
              UNITED STATES DISTRICT COURT
1             SOUTHERN DISTRICT OF NEW YORK
2

3      -------------------------x
       JEFFREY M. GOLDMAN,
4
            Plaintiff,        DEPOSITION UPON
5                             ORAL EXAMINATION
            vs.                         OF:
6
       SOL GOLDMAN INVESTMENTS    DR. DORON KATZ
7      LLC, SOLIL MANAGEMENT, LLC
       and JANE H. GOLDMAN,
8
            Defendants.
9      -------------------------x

10

11      T R A N S C R I P T of the above-entitled matter,

12     being taken pursuant to Superior Court Rules of Civil

13     Practice and Procedure, by and before Deborah J.

14     Arnone, a Certified Court Reporter of the State of

15     New Jersey, with all parties appearing via ZOOM

16     VIDEOCONFERENCE on Thursday, October 14, 2021 at

17     12:00 in the afternoon.

18

19

20

21

22          DENISE SWEET & ASSOCIATES, LLC
23             Court Reporting Services
                  256 Leswing Drive
24            Brick, New Jersey  08723
           (732) 462-6096  Fax (732) 262-7731
25              dsweetassoc@gmail.com


            DENISE SWEET & ASSOCIATES, LLC
```

2

1  A P P E A R A N C E S:

2

3  JOSEPH & KIRSCHENBAUM, LLP

4  32 Broadway, Suite 601

5  New York, NY 10004

6  BY: LEAH SELIGER, ESQ.

7  Attorneys for the Plaintiff

8

9

10  ANSELL, ZARO, GRIMM & AARON, ESQS.

11  1500 Lawrence Avenue, CN7807

12  Ocean, NJ 07712

13  BY: JOSHUA BAUCHNER, ESQ.

14  Attorneys for the Defendants

15

16  ALSO PRESENT: Reena Malhorta, Inhouse counsel for

17  the Defendants

18

19

20

21

22

23

24

25

DENISE SWEET & ASSOCIATES, LLC

3

1                     I N D E X

2

3  E X A M I N A T I O N S                    PAGE

4

5  DR. DORON KATZ

6   DIRECT EXAMINATION BY MR. BAUCHNER    4

7   CROSS EXAMINATION BY MS. SELIGER      55

8

9                   E X H I B I T S

10

11  NO.    DESCRIPTION                     PAGE

12

13

14           INFORMATION REQUESTED

15           Page      Line

16              16        23

17

18

19

20

21

22

23

24

25

DENISE SWEET & ASSOCIATES, LLC

4

1       THE REPORTER:  We are on the record.  My

2  name is Debi Arnone.  I am a certified court

3  reporter, licensed by the State of New Jersey.  My

4  license number is 1346.  I will now swear in the

5  witness.

6

7  DR. DORON KATZ, 177 N. Dean Street, Suite 203,

8  Englewood, New Jersey 07631, having been duly sworn

9  according to law testified as follows:

10

11  DIRECT EXAMINATION BY MR. BAUCHNER:

12       Q.    First question, Dr. Katz, have you ever

13  been deposed before?

14       A.    **Have I been deposed before?  I was**

15  **involved in one court case about seven years ago I**

16  **think.**

17       Q.    Okay.  So, Dr. Katz, the rules of court

18  are very particular with respect to virtual

19  depositions, and I know it's in the middle of the

20  day, and I apologize for the intrusion.  The

21  plaintiff denominated you as a person with knowledge,

22  but there's actually a bar against using any

23  electronic devices or doing anything else while

24  you're being deposed, so I'm going to try to be as

25  quick as I can with you, but I do ask for your

DENISE SWEET & ASSOCIATES, LLC

Case 1:20-cv-06727-MKV   Document 98-4   Filed 02/23/22   Page 3 of 7

Re:  Goldman vs. Sol Goldman Investments, LLC, et als.        Witness:  Dr. Doron Katz        October 14, 2021

**5**

1 undivided attention, please.
2 **A.       So here's the pile of stuff on my desk**
3 **that has to get through and about 50 patients that**
4 **need phone calls, but let's just do this quickly.**
5 **Q.**       I'm doing my best and your attention is
6 appreciated.
7          Were -- do you -- did your office
8 provide to you a copy of the exhibits?  It was
9 e-mailed last night.
10 **A.       Last night?**
11 **Q.**       Yes.
12 **A.       Let me just look real quickly.**
13 **Q.**       Absolutely.  Thank you.  I'm trying to
14 make it as quick as possible for you, sir.
15 **A.       Who did it come from?**
16 **Q.**       It would have come from my office.
17 Probably Rahool.
18 **A.       Let me just look.  Hold on.**
19          MS. SELIGER:  I think it came from
20 Denise actually.
21          MR. BAUCHNER:  Oh, okay.
22 **Q.**       It might have come from Denise Sweet.
23 She's the court reporting service.
24          MS. SELIGER:  No.  Denise Muzzio.
25 **A.       I don't think I got this.**
                    DENISE SWEET & ASSOCIATES, LLC

**6**

1          MR. BAUCHNER:  Why don't we go off the
2 record for this exercise.
3          (An off-the-record discussion was held.)
4          MR. BAUCHNER:  We can go back on the
5 record.
6 BY MR. BAUCHNER:
7 **Q.**       All right.  Dr. Katz, now that we
8 located the exhibits and, again, thank you and
9 counsel for your efforts in that regard.
10          Just quick ground rules, Dr. Katz, as
11 you know you're under oath, so we just request
12 truthful testimony of course.  Everything we're
13 saying is as well being taken down by the court
14 reporter who you see here, and as a courtesy to her
15 so that we have a clean record, I just ask that you
16 allow me to finish my question before you answer.  I
17 will, of course, extend the same courtesy to you.
18          From time to time you might hear
19 counsel, Ms. Seliger, issue an objection.  Unless she
20 specifically for some reason directs you not to
21 answer, she's just making an objection to make a
22 record, so you should feel free to -- after she
23 voices her objection to answer my question, and that
24 will move things on very very quickly so we can get
25 you out of here; all right?
                    DENISE SWEET & ASSOCIATES, LLC

**7**

1 **A.       Yeah.**
2 **Q.**       All right.  Any other questions before
3 we proceed?
4 **A.       Let's do it.**
5 **Q.**       Okay.  Thank you very much.
6          THE REPORTER:  Excuse me.  I have a
7 Reena Malhorta trying to get in.  Is that somebody --
8          MR. BAUCHNER:  She's counsel for the
9 company.  Please.
10          (Reena Malhorta, Esq. entered the zoom
11 meeting.)
12 **Q.**       While we're doing that, if you could
13 just turn to Exhibit 1 which is the First Amended
14 Complaint, and I'm going to direct you to Paragraph
15 31.
16          MS. SELIGER:  Josh, I'm so sorry to
17 interrupt but will Ms. Malhorta being turning on her
18 camera?
19          MR. BAUCHNER:  Reena, you need to turn
20 on your camera if you're going to participate.  Thank
21 you.
22 BY MR. BAUCHNER:
23 **Q.**       Okay.  Dr. Katz, Exhibit 1, Paragraph
24 31.  Please let me know when you have that.  It's on
25 page six if that helps.
                    DENISE SWEET & ASSOCIATES, LLC

**8**

1 **A.       I have it.**
2 **Q.**       Excellent.  In addition to -- for the
3 record Paragraph 31 states, in addition to the
4 COVID-19 related risks resulting from Plaintiff's
5 age, he has many underlying conditions that doctors
6 and experts agree cause people to be particularly
7 susceptible to COVID-19 and much more likely to die
8 as a result of catching the virus.
9          What are plaintiff's many underlying
10 conditions that make him particularly susceptible to
11 COVID-19?
12 **A.       The biggest one is probably age.  I**
13 **would say age.  Yeah, age probably number one, and**
14 **then after that -- after that probably -- yeah, I**
15 **would say age, hypertension.**
16 **Q.**       So it says, in addition to the COVID-19
17 related risks resulting from his age.
18          In addition to his age, what are the
19 many underlying conditions?
20 **A.       Weight.  Weight, age, hypertension, and**
21 **then I would say -- I'd go one step beyond that and**
22 **say his wife is incredibly obese and out of shape.**
23 **Q.**       But that wouldn't make him susceptible
24 to COVID-19, it would make his wife susceptible,
25 correct?
                    DENISE SWEET & ASSOCIATES, LLC

9

1    A.    I mean everybody was susceptible.
2    Q.    That's true.  Everyone's susceptible to
3 COVID.  Right.  So is he particularly susceptible
4 more so than anyone else?
5    A.    Based on age.
6    Q.    He's more susceptible infection based on
7 age?
8    A.    He's more susceptible to getting sicker
9 and dying based on age, weight and comorbidity,
10 hypertension.  I think he has -- I don't know if he
11 has -- let me go look at his labs quickly.  Hold on
12 one second.
13    Q.    Doctor, I'm sorry, you can't do that.
14 Dr. Katz, you can't look at his labs because we
15 don't -- we don't have them, and any document you
16 look at we need to see.
17    A.    Okay.  No problem.
18    Q.    All right.
19    A.    I would say age number one, number two
20 hypertension, number three -- yeah, I would say age,
21 hypertension and then family.
22    Q.    Well, his family doesn't make him
23 susceptible, correct?
24    A.    Makes them susceptible.
25    Q.    Right.  Right.  But the allegation as we
            DENISE SWEET & ASSOCIATES, LLC

10

1 just read is regarding his susceptibility, correct?
2    A.    Yeah.  I mean for him I would say age.
3    Q.    Okay.  Thank you.  Thank you.
4          Paragraph 32 states, because of
5 Plaintiff's underlying conditions, including his age
6 and ongoing symptoms caused by his proximity to the
7 September 11, 2001 terrorist attack on the World
8 Trade Center, Plaintiff's doctor advised him to
9 continue him to work from home and take strict
10 measures to avoid exposure to the virus.
11          Do you see that?
12    A.    Let me just -- let me change also -- I
13 also say weight, weight and blood pressure.  He's
14 over -- his -- by -- by US standards he's overweight.
15 Close to obese.
16    Q.    So, Dr. Katz, just for the record, I'm a
17 New Yorker as well, but we have to talk slowly for
18 the court reporter.  And I realize you're trying to
19 move through this.  I used to get yelled at by court
20 reporters in court all the time to slow down, so I'm
21 sensitive to it.
22    A.    I just want to amend my statement to the
23 age and his weight being close to a BMI that's close
24 to obesity but definitely in the overweight category.
25    Q.    Okay.  And then do you recall I just
            DENISE SWEET & ASSOCIATES, LLC

11

1 read to you paragraph --
2    A.    Let me just add a bit of -- one more
3 statement is that at this point -- I don't know if
4 this is the right time for it -- but at this point
5 there was no vaccine, and there wasn't a single
6 30-year old that was -- that's the wrong terminology.
7 There are very many -- majority of 35-year old men
8 with six packs -- I'm saying it slowly -- with BMIs
9 of 22 that were not going to work.  It was pretty
10 commonplace that almost nobody was going to work
11 except for doctors.
12    Q.    When you say, at this time, what time
13 are you referring to, sir?
14    A.    At the time of the letter that --
15 that -- at the time that I wrote the letter for the
16 patient suggesting that he probably would be safer
17 for him not to go to work.
18    Q.    And what time was that, sir?
19    A.    Let me look.  Can I look at that?
20    Q.    No.
21    A.    I can't recall it.
22    Q.    If you recall it, you'll recall it, but
23 I do have the letter.  I could show it to you.
24    A.    Yeah.  I think somewhere -- somewhere
25 between June and October of 2020.  I looked at it
            DENISE SWEET & ASSOCIATES, LLC

12

1 quickly yesterday.
2    Q.    And are you aware then, sir, that the
3 State of New York actually permitted businesses to
4 reopen and have staff to return in June of 2020?
5    A.    I was not.
6    Q.    Okay.  So in regards to your statement
7 that most businesses were not permitting people to
8 return --
9    A.    I just -- most businesses were not
10 requiring people to go to the office.
11    Q.    Right.  But you were not aware that the
12 Governor had actually advanced the State into I
13 believe it was Phase 3 permitting offices to reopen
14 and people to return to work, correct?
15    A.    I was not.  That being -- that being
16 said, most people in white collar jobs that I know
17 are not going to work now.  It's starting to change
18 in the last month or two I would say, but many of my
19 friends, partners at major accounting and law firms
20 and investment banks, are not going to work still.
21    Q.    That may be the case, sir, but I think
22 we're -- we're more concerned about what the State of
23 New York is permitting here and not your anecdotal
24 opinion with due respect, and the fact that you -- I
25 appreciate your candor having not been aware of that
            DENISE SWEET & ASSOCIATES, LLC

25

1    **Q.**    Throughout the past year and a half?

2    MS. SELIGER: Objection.

3    **A.**    **I did not -- I did not know that.**

4    **Q.**    Do you believe that he would be at risk

5  based upon your earlier statements as a result of

6  being unmasked in a public pool?

7    MS. SELIGER: Objection. What is the

8  question?

9    **A.**    **What do I do now? Can I answer?**

10    **Q.**    Of course. As I instructed you before,

11  she can object but you can always answer over the

12  objection unless she instructs you not to answer it.

13    **A.**    **Yeah. I think if it's a public --**

14    THE WITNESS: Leah, can I answer?

15    MS. SELIGER: I would just want to

16  state, Josh, so that Dr. Katz knows if you --

17    MR. BAUCHNER: No. Ms. Seliger, there's

18  no speaking objections. This is my record, so you're

19  not going to state anything for Dr. Katz to know,

20  please. You levied an objection, and Dr. Katz can

21  now answer. That's all. Please.

22    MS. SELIGER: If he understands the

23  question.

24    MR. BAUCHNER: Dr. Katz was prepared to

25  answer the question until you interrupted him.

DENISE SWEET & ASSOCIATES, LLC

---

26

1    **Q.**    Dr. Katz, please proceed.

2    **A.**    **I would say if -- there is risk if he is**

3  **hanging out in a -- if he's seeing other people close**

4  **on without a mask, yeah.**

5    **Q.**    Such as swimming unmasked in a public

6  pool, correct?

7    **A.**    **I don't know about the swimming part but**

8  **the preparation for swimming.**

9    **Q.**    And what about walking in public parks,

10  for example --

11    MS. SELIGER: Objection.

12    **Q.**    -- would that place him at risk?

13    **A.**    **There's an amazing amount of opinion**

14  **here, Josh, for somebody who's not getting paid. I'm**

15  **enjoying it so I'll keep -- I mean none of this is**

16  **facts, right? You're paying me to be a fact witness?**

17    **Q.**    No, Dr. Katz. I'm not going to quibble

18  with you about the law. You're mistaken. I will

19  tell you, though, for the record if you'll turn to

20  Exhibit-3.

21    **A.**    **Yeah. I don't -- I think walking in a**

22  **public park if there are a lot of people within a**

23  **short distance of him within a few -- within probably**

24  **-- I guess what's set at six feet, and they're not**

25  **masked he probably is at some increased risk.**

DENISE SWEET & ASSOCIATES, LLC

---

27

1    **Q.**    Okay. Thank you. But if you want to

2  look at Exhibit 3, Dr. Katz, just so you understand

3  at page two plaintiff identified you as an individual

4  who may have discoverable information concerning

5  specifically, Dr. Katz may have knowledge concerning

6  plaintiff's underlying health conditions.

7    That's where I reviewed --

8    **A.**    **Thank you. But that's -- okay.**

9    **Q.**    Now, I'm not going to quibble with you.

10  With due respect, I don't think you know the

11  difference between fact and opinion under The Federal

12  Rules of Evidence, so I just would ask to proceed

13  here that we just advance the ball since you do seem

14  to be having fun, like you said, we can save a lot of

15  time.

16    **A.**    **Go-go-go-go. Let's go.**

17    **Q.**    Thank you. Has plaintiff since you

18  wrote this June 3rd letter we've marked as Exhibit 5

19  consulted with you concerning any of the safety

20  protocols that the employer implemented?

21    **A.**    **He has not asked again.**

22    **Q.**    Okay. Did he consult with you -- I

23  apologize if I asked this before -- did he consult

24  with you prior to electing to swim unmasked?

25    **A.**    **No.**

DENISE SWEET & ASSOCIATES, LLC

---

28

1    **Q.**    Did he consult with you prior to

2  electing to go for walks in public parks where there

3  are other people?

4    **A.**    **No.**

5    **Q.**    Okay. Thank you. If you'll turn now,

6  Doctor, to Exhibit 6.

7    **A.**    **Yeah.**

8    **Q.**    And are these the notes to which you've

9  been referring, sir?

10    **A.**    **Yep. They are.**

11    **Q.**    Okay. Plaintiff has alleged, sir, that

12  he has an underlying heart condition which exposes

13  him to higher risk of COVID.

14    Are you aware of that heart condition,

15  sir?

16    **A.**    **He has -- I mean he has mild coronary**

17  **artery -- I shouldn't use the word mild, but he has**

18  **coronary artery disease but not -- I would say not**

19  **significant.**

20    **Q.**    And would it create a higher risk for

21  him for COVID?

22    **A.**    **I mean, again, if you put together his**

23  **age with his weight, with his wife's condition, with**

24  **some mild coronary disease, I think all that together**

25  **given the fact at least at that time that there was**

DENISE SWEET & ASSOCIATES, LLC

29

1    no vaccine would put him at high risk for coronary
2    disease, correct.
3        Q.        And once the vaccine was in place, sir,
4    would that enable the plaintiff to return to work
5    with the safety protections we previously discussed
6    in place?
7        A.        I think it mitigates the --
8            MS. SELIGER:  Objection.  Speculation.
9        Q.        Thank you.  Where does in this report,
10    sir, just on page one where it says, cardiovascular,
11    it says, negative for chest pain, claudication,
12    dizziness, orthopnea, palpitations and pedal edema.
13        A.        Edema.
14        Q.        Excuse me.  Edema.  Where does it
15    address this mild cardiological issue you just
16    referenced, sir?
17        A.        So I'm looking back at the past medical
18    history.  I mean that day he didn't complain of chest
19    pain or any of those cardiac complaints, but in the
20    medical history I tend to have an ongoing record of
21    what his past was like.
22        Q.        And that entry, sir, on 9/12 is that
23    September of 2012?
24        A.        Where are you?
25        Q.        I'm in the past medical history.
            DENISE SWEET & ASSOCIATES, LLC

30

1        A.        Yes.  Yes.  Yes.  I don't know -- I'm
2    not sure why that's not updated, but I don't see it
3    updated.
4        Q.        Okay.  So does the past medical history
5    reflect this mild cardiological condition you
6    referenced?
7        A.        I mean what I have written here is that
8    he -- what's written in the past medical history is
9    just that he had mild disease potentially on an
10    angiogram in 2009 I believe, and then there's not
11    that much more -- I mean it doesn't sound like that's
12    a big part of his medical risk factors.
13        Q.        Okay.  Do you have a record --
14        A.        This is -- oh, sorry, so this note is
15    from 2016.
16        Q.        Yeah.
17        A.        Oh, sorry.  That's why it's not updated.
18    I apologize.
19        Q.        Sure.  That's quite all right.  We're
20    going to go through the rest.
21            So -- and you have them before you.
22    They're from your records, again.  Do you looking
23    through Exhibit 6 have a record of the consultation
24    with the plaintiff in or around June of 2020 that you
25    reference took place?  And if you can just refer to a
            DENISE SWEET & ASSOCIATES, LLC

31

1    page from the exhibit that would be helpful, please.
2        A.        Sorry.  I just lost it.  Where did it
3    go?  I'm on Exhibit 6?
4        Q.        Yes, sir.
5        A.        I don't know how I lost that.  Hold on.
6    I'm pretty sure he came -- one second.  I'm looking.
7    I'm looking.  October 7, 2020.
8        Q.        And for the record while you're looking,
9    Dr. Katz, plaintiff testified that he, in fact, did
10    not visit you in or around June 3rd, 2020 when the
11    note you issued was drafted.
12        A.        I couldn't remember how it -- I'll tell
13    you what I tend to do with these notes.  I thought he
14    came in to discuss it.  I'm looking at it.  Honestly
15    I don't see a note with it.  I tend to add -- when
16    patients want letters like this, I tend to ask them
17    to write a letter, and then I tend to change it -- I
18    have no -- I tend to change it to make it look
19    exactly the way I want it to look.  That's what I
20    usually do just because you get endless letters like
21    this.  Usually they don't end up in court cases, but
22    I thought he came in and brought it to me.  I
23    could -- maybe -- I don't think he e-mailed me but
24    I'll look.  I think he might have mailed it.  I don't
25    remember how I got it, and I remember -- I think I
            DENISE SWEET & ASSOCIATES, LLC

32

1    changed it.  I don't know.  I have to look but it's
2    not in -- you don't have it in the -- you don't have
3    a document anywhere in the chart that has -- you
4    wouldn't know from that I guess.  I don't know.  I'm
5    not sure.
6        Q.        Okay.  So do you have any record, Dr.
7    Katz, of plaintiff visiting you in or around June 3rd
8    of 2020 for a consult related to your letter
9    Exhibit 5?
10        A.        It doesn't look like it.
11        Q.        Okay.  And if I understood your
12    testimony just now, sir, the plaintiff would have
13    provided you with an initial draft of Exhibit 5; is
14    that correct?
15            MS. SELIGER:  Objection.  Speculation.
16        A.        Yes.  I -- I often do things like that.
17    I don't know if I did it here.  I really don't -- I
18    can't recall exactly what happened with the -- I know
19    that's -- I guess that's why you want my e-mails.  I
20    don't think it was in there.  I tried to look
21    quickly.  I didn't look at all of them.
22        Q.        Okay.  Well, in reading Exhibit 5, does
23    that -- is that your letterhead?
24        A.        I'm sorry.  Go back.  Exhibit 5 is the
25    letter?
            DENISE SWEET & ASSOCIATES, LLC

53

1 e-mail, sir?
2    A.    Yes.
3          MS. SELIGER:  Why don't you read it, so
4 we all are looking at the same thing.
5    Q.    The e-mail begins, the UTD was resolved
6 by completion of the prescription.
7          Do you see that, Doctor?
8    A.    Yeah.  I have it.
9    Q.    Okay.  And the e-mail continues, my
10 employer is going to gradually open probably in about
11 two weeks.  I anticipate that I will be expected to
12 return at some point.  Cheryl and I have been
13 strongly quarantined.  I have rarely left the house.
14 I would greatly appreciate it if you can provide me
15 with a very strong emphatic letter that states that I
16 have been your patient for many years, and it is your
17 strong medical opinion that I cannot return to work
18 in the office in New York City or the courts in New
19 York City due to a number of underlying health
20 issues.  Either they will terminate my employment and
21 I will file for unemployment, or I will retire
22 depending on discussions with them.  If you have any
23 questions I can e-mail -- reached by e-mail or at,
24 and then there's a cellphone number I won't put in
25 the record.

DENISE SWEET & ASSOCIATES, LLC

54

1          Do you recall receipt of that e-mail,
2 sir?
3    A.    Yeah.
4    Q.    And that language appears to be the
5 basis for your letter of June 5th, correct?
6    A.    Yeah.
7    Q.    In fact, much of that language was
8 incorporated into your letter, correct, sir?
9    A.    Yeah.
10   Q.    And for the record there was no further
11 consultation with plaintiff at that time, correct?
12   A.    I -- I must have spoken to him about the
13 letter, and then I must have adapted.  I don't see I
14 have a record of that.  But I would assume I did.  I
15 mean I --
16   Q.    Sure.  And, Doctor, you produced your
17 telephonic notations, right?  Your records of those
18 telephone consultations, correct?
19   A.    Yeah.
20   Q.    And there's no indication of a
21 consultation with Mr. Goldman in or around May 28th,
22 2020, correct?
23   A.    I think it -- I think it must have been
24 by telephone.
25   Q.    Doctor, if I understood you correctly,

DENISE SWEET & ASSOCIATES, LLC

55

1 you have records of your telephone consultations,
2 correct?
3    A.    I did not document anything.
4    Q.    Okay.  Thank you.  So you have no record
5 of any communication with Mr. Goldman in or around
6 May 28th, 2020, correct, other than this e-mail?
7    A.    Correct.
8    Q.    Thank you.  Doctor --
9    A.    I just want to make sure it's not in
10 another -- okay.  Keep going.  I'm listening to you.
11 I'm just trying -- I'm just checking my e-mail list
12 just to see if there's any other ones.  I don't think
13 so.
14   Q.    Dr. Katz, we're going to I think adjourn
15 for the day.  We will reserve --
16         MS. SELIGER:  I need to ask --
17         MR. BAUCHNER:  Okay.  I'm okay to speak.
18   Q.    We're going to reserve our rights to
19 recall you, sir, as you know, but if counsel wants to
20 ask you some questions she should feel free to do so
21 at this time.
22
23 CROSS EXAMINATION BY MS. SELIGER:
24   Q.    Okay.  Dr. Katz, I just have a few
25 questions.

DENISE SWEET & ASSOCIATES, LLC

56

1          I'm going to direct your attention,
2 again, to Exhibit 5 that was presented by defendants,
3 that was your June 3rd, 2020 letter?
4    A.    Okay.
5    Q.    Do you know which letter?
6    A.    Yeah.  I have it.
7    Q.    Okay.  When you signed that letter, did
8 you believe the statements made in the letter were
9 true?
10   A.    100 percent.
11   Q.    Was there a vaccine for COVID-19 in June
12 of 2020 when you signed the letter?
13   A.    Nope.  Actually I looked up the other
14 day just because I knew this case was coming.  I
15 think the vaccine first came out in December of 2020.
16   Q.    Were there conditions widely accepted by
17 doctors at the time as causing certain people to be
18 more at risk if they contracted COVID-19?
19         MR. BAUCHNER:  Objection to form.
20   A.    Can I answer?
21   Q.    Yes.
22         MR. BAUCHNER:  Yes.
23   A.    Yeah.  For sure there were.
24   Q.    Did you believe your patient Jeff
25 Goldman had one or more of those risk factors?

DENISE SWEET & ASSOCIATES, LLC