Joshua S. Bauchner, Esq.
Rahool Patel, Esq.
ANSELL GRIMM & AARON, P.C.
365 Rifle Camp Road
Woodland Park, New Jersey 07424
Tel: (732) 922-1000 | Fax: (732) 922-6161
*Attorneys for Defendants*

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| JEFFREY M. GOLDMAN, | DOCKET NO.: 1:20-cv-6727-AJN |
| Plaintiff, | CIVIL ACTION |
| v. | |
| SOL GOLDMAN INVESTMENTS LLC, SOLIL MANAGEMENT, LLC, and JANE H. GOLDMAN, | |
| Defendants. | |

## DEFENDANTS SOL GOLDMAN INVESTMENTS LLC, SOLIL MANAGEMENT, LLC, AND JANE H. GOLDMAN'S OBJECTIONS TO THE AUGUST 5, 2022 REPORT AND RECOMMENDATION OF THE HONORABLE SARAH NETBURN, U.S.M.J.

## TABLE OF CONTENTS

TABLE OF AUTHORITIES………………………………………………………….  ii

PRELIMINARY STATEMENT……………………………………………………...  2

LEGAL STANDARD……………………………………..…………………………  3

OBJECTIONS……..…………………………………………………………………..  4

   I.    CONTRARY TO THE REPORT, DEFENDANTS DISPUTE THAT PLAINTIFF
HAD A DISABILITY AND, IN ANY EVENT, PLAINTIFF DID NOT INFORM
DEFENDANTS OF ANY ALLEGED DISABILITIES…..………………………..  4

  II.   THE REPORT WRONGLY CONCLUDES THAT DEFENDANTS DID NOT
ENGAGE IN THE INTERACTIVE PROCESS REQUIRED BY THE
NYCHRL ……………………………………………...………………………..  9

 III.   THE REPORT INCORRECTLY INFERS THAT SOLIL TERMINATED
PLAINTIFF BASED ON THE THINNEST REED OF EVIDENCE ……...……..  15

 IV.  THE REPORT WRONGLY DENIED SGI'S CROSS MOTION BY
ERRONEOUSLY CONCLUDING THAT SGI COULD BE PLAINTIFF'S
EMPLOYER ..…………………………………………………………….....  17

CONCLUSION…………………………………..…………………………………..  19

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Kane v. City of Ithaca*,
   No. 3:18-CV-0074 (ML), 2019 U.S. Dist. LEXIS 188376 (N.D.N.Y. Oct. 30,
   2019) ...........................................................................................................................................7

*Pimentel v. Citibank, N.A.*,
   811 N.Y.S.2d 381 (App. Div. 1st Dep't 2006) ..........................................................................4

*Ramirez v. Temin & Co.*,
   2021 U.S. Dist. LEXIS 183760 (S.D.N.Y. Sep. 24, 2021)....................................................4, 7

*Matter of Strong v. Fernandez,*
   133 N.Y.S.3d 377 (4th Dep't 2020)....................................................................................10, 11

*Tesher v. Sol Goldman Invs., LLC,*
   2011 N.Y. Misc. LEXIS 2644 (N.Y. Cty. Supr. Ct. May 31, 2011) .......................................18

**Statutes**

28 U.S.C. § 636(b)(1) ...........................................................................................................1, 2, 3, 19

New York City Human Rights Law ("NYCHRL")............................................................... *passim*

**Other Authorities**

Federal Rule of Civil Procedure 72(b)................................................................................1, 2, 3, 19

Pursuant to 28 U.S.C. § 636(b)(1) and Federal Rule of Civil Procedure 72(b), Defendants Sol Goldman Investments LLC ("SGI"), Solil Management, LLC ("Solil"), and Jane H. Goldman ("Ms. Goldman") (collectively, "Defendants") submit these objections to the August 5, 2022 Report and Recommendation of the Honorable Sarah Netburn, U.S.M.J. ("the Report"), which granted Plaintiff Jeffrey M. Goldman ("Plaintiff")'s motion for partial summary judgment filed with respect to his disability discrimination claim under the New York City Human Rights Law ("NYCHRL") and denied SGI's cross motion for summary judgment.

For the reasons that follow, Defendants respectfully submit that the Court should reject the Report in full.

## PRELIMINARY STATEMENT

The Court should decline to follow the Report because Defendants presented numerous genuine issues of material fact precluding the entry of partial summary judgment in favor of Plaintiff on his NYCHRL disability discrimination claim, including: (1) whether Plaintiff suffered from a disability; (2) whether Plaintiff submitted a valid request for an accommodation; (3) whether Plaintiff meaningfully participated in the interactive process offered by Solil; and (4) the nature of Plaintiff's separation from his employment with Solil.  In addition, SGI established that it was not Plaintiff's employer.  Because the Report failed to adequately and properly consider these issues, the Court should review the matter *de novo*, pursuant to 28 U.S.C. § 636(b)(1) and Federal Rule of Civil Procedure 72(b), and reject the Report in its entirety.

## **LEGAL STANDARD**

Under 28 U.S.C. § 636(b)(1)(C), "[a] judge of the court shall make a *de novo* determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." *See also* Fed. R. Civ. P. 72(b) ("The district judge must determine *de novo* any part of the magistrate judge's disposition that has been properly objected to. The district judge may accept, reject, or modify the recommended disposition; receive further evidence; or return the matter to the magistrate judge with instructions.").

**OBJECTIONS**

I.   **CONTRARY TO THE REPORT, DEFENDANTS DISPUTE THAT PLAINTIFF HAD A DISABILITY AND, IN ANY EVENT, PLAINTIFF DID NOT INFORM DEFENDANTS OF ANY ALLEGED DISABILITIES**

The Report states:   "Although Defendants quibble with the exact nature of Plaintiff's disability, they do not dispute that he had one within the meaning of the NYCHRL.  Given the City Council's directive that the NYCHRL be construed 'broadly in favor of discrimination plaintiffs, to the extent that such a construction is reasonably possible,' I conclude that Plaintiff has established that he is a person with a disability within the meaning of the statute."  Report at 17.  This is not an accurate reflection of Defendants' position, and the Report reaches an erroneous conclusion.

Defendants do dispute that Plaintiff has a disability under the NYCHRL.  The record shows that Plaintiff did not identify any medical conditions qualifying as a disability in his communications with Solil prior to quitting his job.  *See Pimentel v. Citibank, N.A.*, 811 N.Y.S.2d 381, 387 (App. Div. 1st Dep't 2006) ("In any event, it is clear that a proponent of a NYHRL claim has the burden of establishing that she proposed a reasonable accommodation and that the defendant refused to make such accommodation. …. The obligation of reasonable accommodation is also limited to the employer's knowledge of the disability that needs to be accommodated…. In this case, the defendant cannot be held liable for failing to provide the plaintiff with an accommodation since she failed to adequately explain the extent and limits of her restrictions.") (citations deleted).  Vague, non-specific references to medical conditions without anything further do not constitute a disability under the NYCHRL.  Indeed, it is impossible to engage in an interactive dialogue concerning the provision of a reasonable accommodation if the employer does not know what the disability is to determine how to accommodate it.  *Ramirez v. Temin & Co*., 2021 U.S. Dist. LEXIS 183760, at *38-39 (S.D.N.Y. Sep. 24, 2021) ("Under state and federal law,

'generally, it is the responsibility of the individual with a disability to inform the employer that an accommodation is needed.'").

First, Plaintiff's purported request for an accommodation apparently arose from his generalized fear of COVID and his concerns about his age. However, neither of these "underlying conditions" rise to the level of a disability under the NYCHRL requiring an accommodation. *See* NYC Human Rights, "COVID-19 & Employment Protections," https://www1.nyc.gov/site/cchr/community/covid-employment.page (last visited Aug. 19, 2022) (Under the NYCHRL, employers are not required to provide reasonable accommodations to employees arising from a general fear of COVID and age.)

Second, the June 17, 2020 email that Plaintiff sent to Judy Brener and Concetta Ferrari did not identify any specific disability whatsoever. SAMF ¶ 3.[1] It simply contained a vague reference to "a number of underlying health issues," with no further information. *Id.* Age, as a purported disability -- which, in any event, fails as a matter of law -- was not mentioned either. Second, no disability was identified -- nor were the "underlying health issues" -- in the June 3, 2020 note from Dr. Doron Katz, which Plaintiff secretly drafted himself and then held in his back pocket for several weeks. SAMF ¶ 8. Dr. Katz's note simply repeated that Plaintiff had "several underlying conditions" without any detail and, again, made no mention of Plaintiff's age. SAMF ¶ 43. Third, Plaintiff alleges, on the one hand, that Jane Goldman is a micromanager and made every decision, SAMF ¶ 11, yet on the other hand deliberately failed to send the June 17, 2020 email to Ms. Goldman. SAMF ¶ 3. *Query*: If Plaintiff sought a cooperative dialogue to discuss a reasonable accommodation, why did he fail to contact the very person he, himself, identified as the sole

---

[1]     ECF No. 105, which as the Report explains "collates [P]laintiff's initial Rule 56.1 Statement in support of its motion for summary judgment and [D]efendant[s'] responses to each statement."

decisionmaker at Defendants?   Again, Plaintiff's gamesmanship and corresponding credibility issues were left wholly unaddressed by the Report.

In fact, Defendants only learned of the purported "underlying health issues" that Plaintiff was apparently referring to in his June 17, 2020 email -- hypertension (high blood pressure), being overweight, and coronary artery disease -- ***when he filed this litigation***.   None of these purported conditions were raised in his communications with Solil when Plaintiff claimed he made his "request" for an accommodation.   And, importantly, Plaintiff's own physician testified that none of these conditions present a higher risk of COVID.   SAMF ¶ 42; Katz Tr. 28:11-29:2.   The Report wholly failed to address these critical issues confirming Plaintiff suffers from no disability in the first instance.

Third, also left unmentioned in the Report, was Plaintiff's ***admission*** that he did not request an accommodation under the NYCHRL:

> A:      Actually, I take that back I never even got to ask for the accommodation. I was
>         fired the minute it was all brought up basically, so...
>
> Q.      So you weren't asking for a reasonable accommodation, sir?
>
> A.      I would have if I was given a chance, but I was fired.

SAMF ¶ 3.   Plaintiff then changed his testimony contending that he requested an accommodation in an email to Judy Brener and Concetta Ferrari on June 17, 2020, which stated:

> As you know, I have been working from home since March 17, 2020, and I appreciate having been able to do that.  I have a number of underlying health issues. I do not go to stores.  I do not go to synagogues.  I do not allow either of my daughters to come to my home.  I have not seen my daughter, Jordana, in 6 months. She knows that she can't come here, and she is flying from Los Angeles to Baltimore, without stopping here.  I have consulted with my physician.  He has provided me with a letter. ***I will not be able to return to court, and I will not be able to return to the office.***  I can, however, continue working from home.

SAMF ¶ 9.   Notably, the June 17, 2020 email did not contain ***any request whatsoever***.  It also did not specify what medical conditions Plaintiff claimed to have apart from the vague reference to "a

number of underlying health issues." *Id*. Moreover, the email made clear that Plaintiff would never be willing to return to court and would never be willing to return to the office. *Id*. Nowhere in the email does Plaintiff state that his unwillingness to return to court or the office -- both essential functions of his position -- would be temporary and time-limited. *Id*.

This is further supported by Ms. Goldman's deposition testimony. She testified that Plaintiff "didn't ask for any accommodations from me" and "[h]e never asked me." SAMF ¶ 22. She further testified: "No. He didn't ask me. Just for your information, we accommodated everyone throughout this entire process. He did not ask for an accommodation." SAMF ¶ 23. The deposition testimony of Ms. Goldman makes clear – on multiple occasions – that Plaintiff did not request an accommodation whatsoever. At a minimum, Plaintiff's own, conflicting testimony raises credibility issues and disputed questions of fact -- particularly in the face of Ms. Goldman's testimony -- precluding summary judgment.[2]

Fourth, the Report further states that "Plaintiff's June 17, 2020, email to Brener and Ferrari, along with the note from Dr. Katz, was sufficient to put Defendants on notice of his disability" because "Plaintiff's email and Dr. Katz's note clearly communicated that he suffered from underlying conditions putting him at greater risk of contracting severe COVID-19." Report at 17. The mere, vague reference to "underlying conditions" is patently insufficient notice of any

---

[2]    The law is clear that "[a]n employer is not ordinarily required to provide accommodations where the employee has not requested accommodations." *Kane v. City of Ithaca*, No. 3:18-CV-0074 (ML), 2019 U.S. Dist. LEXIS 188376, at *28 (N.D.N.Y. Oct. 30, 2019) (quoting *Nihon Kohden America*, 15-CV-1503, 2018 U.S. Dist. LEXIS 163948, at *10 (N.D.N.Y. Sept. 25, 2018)); *Ramirez*, 2021 U.S. Dist. LEXIS 183760, at *38-39 ("Under state and federal law, '***generally, it is the responsibility of the individual with a disability to inform the employer that an accommodation is needed***.'") (emphasis added). While the NYCHRL is admittedly broader than the ADA and the NYSHRL to the extent it requires an employer to engage in a "cooperative dialogue" when it is placed on notice of a potential disability, the NYCHRL does not require employers to be mind-readers.

disability permitting an accommodation.  And, in truth, none of the purported conditions later alleged in the Complaint render him any more susceptible to COVID-19, as Plaintiff erroneously claims, requiring an accommodation as confirmed by his own physician.  SAMF ¶ 42; Katz Tr. 28:11-29:2; 58:2-3 (testifying he would have written the same letter for almost anyone thereby defeating claim that Plaintiff suffered a disability).

As is plain, neither the email that Plaintiff wrote nor the doctor's note he provided contain sufficient information to place Defendants on notice of Plaintiff's alleged disability.  The Report fails to account for the indisputable fact that none of the alleged conditions Plaintiff relies upon is visible to the naked eye.  As our brief explained, one cannot ascertain hypertension or coronary artery disease from an outward examination of an individual.  In addition, overweight or even obese individuals often appear outwardly very similar to individuals with a "normal" bodyweight.  Plaintiff himself conceded this at his deposition when he stated: "Obviously, high blood pressure is not something that is visible to the naked eye.  It's some[thing] within one. . . .  Heart things, that is internal."  SAMF ¶ 11.  In light of Plaintiff's admission that his alleged conditions were not readily visible, it was not appropriate for the Report to conclude that Plaintiff had "clearly communicated" information about his "greater risk of contracted severe COVID-19" to Defendants; particularly when the science (of which the Court can take judicial notice) confirms the opposite.  Report at 17.

Fifth, and again nowhere mentioned in the Report, Plaintiff never provided any description of his medical conditions to Solil when he made his demand, nor did he indicate that he could ever return to work in an office setting.  SAMF ¶ 10.  And, Dr. Katz testified that:  (i) he "probably would have written the same letter for almost anybody[;]" (ii) he did not actually examine or even consult with Plaintiff prior to issuing the note (which Plaintiff, himself, initially drafted); (iii) the

primary "underlying condition" was Plaintiff's age, compounded by his weight, and not any heart condition as alleged; (iv) he was not aware that the Governor was permitting business to reopen at the time he provided the note; and (v) he did not inquire, was not told by Plaintiff, and thus was completely unaware of any of the extensive safety precautions implemented by Solil.  SAMF ¶ 42. As a consequence, the June 3, 2020 note from Dr. Katz merely ambiguously states that Plaintiff had "several underlying medical conditions" which prevented him from "work[ing] in an office building or the courts in New York City" with no further explanation.  SAMF ¶ 43.  It did not explain that Plaintiff's demand to work from home was time-limited in duration and it proposed no other solutions short of working remotely all of the time and making no court appearances whatsoever.  SAMF ¶ 44.  In the absence of his ability to perform the essential functions of his job (and the ensuing undue burden that acceding to his demand to work remotely would have caused to Solil), Plaintiff was not entitled to the accommodation that he purportedly requested.

Sixth, Plaintiff's email was not a "request" for an accommodation.  Rather, it was a unilateral declaration by Plaintiff that he had taken it upon himself to rewrite the terms and conditions of his employment in deciding that he was going to work from home and never go to court for the rest of his legal career.  Accordingly, the Report's conclusion that "the plain implication of both the email and the note was that Plaintiff sought to continue remote work" is not an accurate reading of the record.  Report at 18.

Any of these issues alone forecloses summary judgment and, in the aggregate, required denial of the Motion.  Accordingly, these objections should be sustained and the Court should reject the Report.

## II.   THE REPORT WRONGLY CONCLUDES THAT DEFENDANTS DID NOT ENGAGE IN THE INTERACTIVE PROCESS REQUIRED BY THE NYCHRL

The Report determines that Defendant "failed to engage in a cooperative dialogue as required by the NYCHRL" and "neither Plaintiff nor Defendant Goldman testified that she requested additional information about his conditions and limitations, offered or discussed available alternatives, or even discussed his request for an accommodation at all."  Report at 18. The Report reads as if Plaintiff sent an email requesting to work from home and Solil simply fired him, which is ***not*** what happened.  Thar simply is not a fair characterization of the record before the Court.

In truth, as set forth below, it was Plaintiff who failed to engage in a good faith dialogue with Defendants.[3]   § 8-107(28)(a) ("[i]t shall be an unlawful discriminatory practice for an employer . . . ***or an employee*** or agent thereof to refuse or otherwise fail to engage in a cooperative dialogue within a reasonable time with a person who has requested an accommodation or who the covered entity has notice may require such an accommodation[.]") (emphasis added).   The NYCHRL defines "cooperative dialogue" to mean "the process by which a covered entity and a person entitled to an accommodation, or who may be entitled to an accommodation under the law, engage in good faith in a written or oral dialogue concerning the person's accommodation needs; potential accommodations that may address the person's accommodation needs, including alternatives to a requested accommodation; and the difficulties that such potential accommodations may pose for the covered entity."  § 8-102.

---

[3]      *See Matter of Strong v. Fernandez*, 133 N.Y.S.3d 377, 380 (4th Dep't 2020) ("[B]oth the employer and the employee have a duty to act in good faith once the interactive process begins . . ., and [a]n employee who is responsible for the breakdown of that interactive process may not recover for a failure to accommodate[.]") (citation omitted).

10

Upon receiving the June 17, 2020 email and, later upon request, Dr. Katz's note, Solil attempted to engage in a constructive dialogue with Plaintiff. In particular, Ms. Brener initially responded to Plaintiff via email, requesting he contact her. SAMF ¶ 65. Plaintiff failed to respond. Ms. Brener then called Plaintiff, but he failed to answer. SAMF ¶ 71. Ms. Brener then again emailed Plaintiff and requested he contact her. SAMF ¶ 66; Brener Tr. 46:25-47:6. Plaintiff again failed to respond.

Ms. Goldman further testified that Ms. Brener provided Plaintiff's June 17, 2020 email to her. SAMF ¶ 12. Upon receiving the email from Ms. Brener, Ms. Goldman immediately called Plaintiff to speak with him, "at which point he made it clear that he had no intention of coming back to the office." SAMF ¶ 13. Plaintiff had no interest in engaging with Ms. Goldman despite her efforts and he simply refused to engage in any discussion regarding his alleged disability or an accommodation. Ms. Goldman testified: "[Plaintiff] never offered to help or give any other suggestions. He didn't try to work out a way to make this work. He just said, I'm not doing it." SAMF ¶ 14. An "interactive dialogue," by definition, requires *interaction* by both parties. Nevertheless, the Report improperly blames Defendants for Plaintiff's refusal to engage in good faith.

There is significant evidence in the record -- left wholly unaddressed by the Report -- demonstrating that Defendants, through Ms. Brener and Ms. Goldman, attempted to constructively engage with Plaintiff and that he spurned those efforts at every juncture notwithstanding his own obligation to proceed in good faith. SAMF ¶ 8; *see Matter of Strong*, 133 N.Y.S.3d at 380. The undisputed record evidence confirms that Ms. Goldman specifically called Plaintiff to speak with him concerning his email and Plaintiff demanded that he be fired to collect unemployment. SAMF ¶ 17. Yet, the Report inexplicably asserts that Defendants failed to engage. This is plain error. At

11

a minimum, it raises a disputed fact as to whether a cooperative dialogue occurred precluding summary judgment.

Indeed, for the avoidance of any doubt, Plaintiff communicated with his doctor that if Defendants refused to accede to his demand to work from home indefinitely, he would either get fired and collect unemployment, or retire. SAMF ¶ 6. Specifically, on May 28, 2020, Plaintiff sent an email to his primary care physician, Dr. Katz, in which he stated:

> My employer is going to gradually open probably in @ 2 weeks. I anticipate that I will be expected to return at some point. Sheryl and I have been strongly quarantined. I have rarely left the house. I would greatly appreciate it if you can provide me with a very strong emphatic letter that states that I have been your patient for many years and it [i]s your strong medical opinion that I cannot return to work in an office in New York City or the courts in New York City due to a number of underlying health issues. Either they will terminate my employment and I will file for unemployment or I will retire depending on discussions with them.

*Id.* The email -- which Plaintiff stunningly failed to produce -- clearly shows that he hoped to be fired to commence suit against Defendants as early as May 28, 2020, several weeks before he demanded to only work from home. SAMF ¶ 7. Moreover, he held the note for more than two weeks "as a back up" before providing it to Solil; although he inconsistently testified that he did not believe he would need the note relying instead on Solil's consistent extension of "good faith" towards him over 20 years. SAMF ¶ 8. In other words, Plaintiff's demand for a work-from-home accommodation was a pretext for his concocted plan to get fired and collect enhanced unemployment benefits (which were available at the time) and a sizable pension. SAMF ¶ 15.

Plaintiff admitted the existence of this plan in his conversation with Ms. Goldman. SAMF ¶ 16. During her deposition, Ms. Goldman recounted the following conversation with Plaintiff, in which he expressed his clear desire not to return to work in the office or to court:

> … I was shocked that he had decided that he was no longer coming into the office and no longer going to court, which was his primary responsibility, so I gave him

12

a call.  I was surprised he hadn't called me himself, considering, as you said, that he's been a long-term employee, that he didn't contact me personally, so I took that on myself and I called him, at which point he made it clear that he had no intention of coming back to the office.  I said, [w]ell, Jeff I guess that means you're retiring. And he said, [n]o, that doesn't mean that.  Could you fire me so that I can collect Unemployment?  Which, as he stated yesterday in his deposition, he wanted me to fire him so he could collect Unemployment, which he stated to me on the phone, and he acknowledged yesterday in his very own deposition.  And I said, Jeff, I'm going to take this as your retirement, that's not what happened.  I said, [y]ou have a pension.  Why would I fire you?  Why would you take Unemployment?  You're refusing to come to work and you have a pension.  If that's what you're going with, go with your pension and enjoy your retirement.

SAMF ¶ 17.  This exchange was confirmed by Plaintiff's own testimony: "I am not going to retire. You'd have to fire me, then I will collect unemployment."  SAMF ¶ 18.  Plaintiff simply cannot claim that he was fired after ***admitting*** that Ms. Goldman ***refused*** to fire him (which may explain why he alleged and testified that he was actually "furloughed").  SAMF ¶ 19.

The Report also fails to address that Plaintiff alleged in his Complaint that he was "furloughed," not fired, rendering the whole of his claim a nullity.  *Id.*  At a minimum, this allegation raises disputed facts as to whether Plaintiff retied, was furloughed or fired, and raises credibility issues as to whether his purported request for an accommodation was merely a pretext for his concocted plan to get fired and collect enhanced unemployment benefits and a sizable employer-provided pension.  SAMF ¶ 2.

Plaintiff's credibility issues -- which preclude summary judgment and were never addressed in the Report -- are rampant.  Indeed, Plaintiff testified that a host of allegations in his Complaint were ***false*** including, *inter alia*, that:  (i) the blatant and endemic discriminatory practices at Solil leading to his alleged termination simply do not exist; (ii) he did not still suffer symptoms from exposure to 9/11; (iii) he was not furloughed, but fired; (iv) he was not entitled to unused vacation and sick time; (v) he suffered no harm to his reputation; and, shockingly, (vi) he never asked for a reasonable accommodation, although he then recognized the error of his candor

and changed his testimony.  SAMF ¶ 3.  Yet, none of these credibility issues were even mentioned, never mind addressed, in the Report.

The Report also failed to address Plaintiff's admitted desire to get fired, collect unemployment, and commence this suit is further confirmed by his true interest:  to get paid to sit at home and not work.[4]  Indeed, Plaintiff testified that in the 20 months since his departure from Solil he made no honest effort whatsoever to secure new employment -- preferring instead to collect the sizable pension provided by Solil and to pursue this frivolous action -- even though he is fully vaccinated and there are numerous attorney jobs available where he could have interviewed remotely and potentially asked for a work-from-home accommodation depending on the nature of the job duties.  SAMF ¶ 46.  Furthermore, the last sentence of the May 28, 2020 email confirms that Plaintiff contemplated retiring -- as suggested by Ms. Goldman -- "depending on discussions with [Solil]."  SAMF ¶ 8.  Certainly, this shows that Plaintiff had no real intention of continuing his legal career with Solil, or elsewhere.  SAMF ¶ 6.  Plaintiff also was wholly unable to identify any individuals who believed that his reputation was harmed as a result of Defendants' alleged actions, precluding any damages arising from that assertion.  SAMF ¶ 47.

Moreover, the Report fails to mention, let alone accord any weight, to the numerous safety measures Solil instituted to protect employees from COVID-19, all of which Plaintiff rejected.  It ignores that the company mandated temperature checks of employees "[t]he minute [they] walk[ed] in the building" and before they came upstairs to the office area.  SAMF ¶ 25.  It further ignores that their temperatures were taken a second time upon reaching Solil's floor.  SAMF ¶ 26.  And the list goes on.  The Report makes no mention that Solil set up multiple pop-up stations with

---

[4]     Notwithstanding 20 years of lucrative employment, a full pension, and having his daughters' college education paid for by Ms. Goldman, Plaintiff apparently was unhappy in his job and eager to leave.  SAMF ¶ 38.

Purell antibacterial handwashing solution.  SAMF ¶ 27.  Or that it established a "one-directional traffic" pattern "so nobody would cross one another."  SAMF ¶ 28.  There is no reference to Ms. Goldman's testimony that "[Solil's] office is very large, it has a capacity to accommodate 250 people, but it's so spread out that we only have 55 people in the office, so there is more than enough breathing room."  SAMF ¶ 29.  The Report also fails to recognize that the company installed air filters, closed the lunchroom, only permitted one person to use the restroom at a time, installed Plexiglass partitions around the office, and required employees to ride the elevators on their own.  SAMF ¶¶ 30-34.  Most astonishingly, the Report does not mention that Solil provided free garage parking "so that they could get in the City and not have to take public transportation."  SAMF ¶ 35.  All of these measures constitute the very reasonable accommodation Plaintiff sought but refused to consider in favor of his determination to work from home indefinitely.  Plaintiff's willful ignorance of these safety precautions and refusal to engage in an interactive process only confirms that his purported request was pretextual and preplanned.  SAMF ¶ 37.

Again, the fact that Plaintiff refused to consider any of these safety measures is substantial, credible evidence of the fact that Plaintiff spurned the effort of Solil to engage in a "cooperative dialogue."  At a minimum, these issues raise disputed facts as to whether an accommodation was provided -- regardless of whether Plaintiff both rejected a cooperative dialogue and the accommodations offered -- precluding summary judgment.

## III.   THE REPORT INCORRECTLY INFERS THAT SOLIL TERMINATED PLAINTIFF BASED ON THE THINNEST REED OF EVIDENCE

The Report also states that "[e]ven construing the facts in the light most favorable to Defendants . . . the uncontested facts give rise to the inference that Plaintiff was fired."  Report at 23.  The basis for the Report's conclusion appears solely to be "Plaintiff's access to Defendants'

computer network, his email, and work computer was suspended, and his health insurance benefits were terminated." *Ibid.*

However, on a motion for summary judgment, if this inference had been properly drawn in the non-moving parties' favor (as the Report purported to do), the Report would have recognized that the very same actions would have occurred regardless of whether Plaintiff's separation was voluntary or involuntary and whether classified as a resignation, retirement, termination, or otherwise.  Any employee separating from employment would have experienced the same deactivating of their email and computer access and the eventual termination of benefits because an individual who longer works for the company no longer needs access to the company's data, some of which is proprietary and highly confidential, or benefits provided by that company.  The Report also utterly discounted Ms. Goldman's testimony.  She testified several times that Plaintiff quit his job:  "Mr. Goldman terminated his own employment[,]" "He retired.  He resigned[,]" and "He quit.  He left us.  After 20 years he just quit."  SAMF ¶ 39.  Ms. Goldman further testified:  "I didn't want him to quit.  I wanted him to stay.  Nobody wanted him to leave.."  SAMF ¶ 40.

In light of this testimony, and the Concetta Ferrari Declaration where she stated under oath that she "never told Ms. Fleytas that Mr. Goldman was fired" (SAMF ¶ 69), there was at a minimum a genuine issue of material fact as to whether Plaintiff was fired or voluntarily separated from his employment.  And, as set forth above, Plaintiff's own Complaint alleges that he was "furloughed," not fired, creating a disputed fact left unaddressed by the Report.  SAMF ¶ 19.  Compounding this failure, the Report did not address Ms. Goldman's unequivocal testimony that she refused to fire Plaintiff.  SAMF ¶ 17.  This exchange was confirmed by Plaintiff's own testimony: "I am not going to retire.  You'd have to fire me, then I will collect unemployment." SAMF ¶ 18.  Plaintiff simply cannot claim that he was fired after ***admitting*** that Ms. Goldman

*refused* to fire him (which may explain why he alleged and testified that he was actually "furloughed"). SAMF ¶ 19.

Accordingly, the Report wrongly determined that Plaintiff was fired, ignored disputed fats and credibility issues, and incorrectly recommended that Plaintiff's motion for summary judgment on his discriminatory discharge claim should be granted. This objection should be sustained and the Report should be rejected on this issue.

## IV.   THE REPORT WRONGLY DENIED SGI'S CROSS MOTION BY ERRONEOUSLY CONCLUDING THAT SGI COULD BE PLAINTIFF'S EMPLOYER

Finally, the Report found that "Defendant SGI has failed to meet its burden of establishing that it is not Plaintiff's employer and has not raised a triable issue of material fact in response to Plaintiff's evidence that SGI and Solil operated as a single integrated enterprise." Report at 16. Accordingly, the Report "recommended that the Court deny SGI's cross-motion for summary judgment." *Ibid.* This determination also was incorrect.

The Report accorded no weight to the evidence supplied by SGI. During his deposition, Plaintiff confirmed that he considered Solil and only Solil his employer for all intents and purposes. Further, he never questioned his tax forms which only identify Solil as his employer, he never questioned the pay notice he received under New York state law which only identify Solil as his employer, and he never questioned the identity of his employer at any point in time during his entire time at Solil. The mere fact that he represented other companies in judicial and quasi-judicial proceedings did not magically transform him into an employee of each and every one of those companies, including SGI. As we noted in our brief, applying Plaintiff's reasoning, the undersigned and anyone working with the undersigned at this law firm also would be employees of Solil and SGI because, in any attorney-client relationship, the clients are ultimately the decision-makers on major issues. The illogic of such an argument should be self-evident.

17

Moreover, the Report's conclusion that "Solil and SGI function as a single integrated enterprise" is contradicted by earlier case law.  Report at 13.  In *Tesher v. Sol Goldman Invs., LLC*, the New York County Supreme Court concluded that Solil and SGI were not the same entity or a single enterprise.  2011 N.Y. Misc. LEXIS 2644, *38 (N.Y. Cty. Supr. Ct. May 31, 2011).  The court even opined that Solil had no relationship with SGI.  *Id.* at *21.  The fact that the *Tesher* Court reached the exact opposite conclusion should give this Court grave doubts about the Report's recommendation on this point.

There is no competent evidence in the record for the Report to have reached the conclusion that SGI could have been Plaintiff's employer on a single integrated enterprise theory.  Accordingly, this objection should be sustained and the Report should be rejected on this point.

## <u>CONCLUSION</u>

For the foregoing reasons, Defendants respectfully file these objections to the Report and request that the Court, pursuant to  28 U.S.C. § 636(b)(1) and Federal Rule of Civil Procedure 72(b), reject the Report in its entirety.

Respectfully submitted,

_____
Joshua S. Bauchner, Esq.
Rahool Patel, Esq.
Ansell Grimm & Aaron, P.C.
*Attorneys for Defendants*

Cc:     Counsel for Plaintiff (via ECF)